STATE OF CONNECTICUT *v.* MICHAEL KENDALL
(AC 30861)

Beach, Flynn and Schaller, Js.

626

Argued April 5—officially released September 14, 2010

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Bruce R. Lockwood*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *Donna Mambrino*, senior assistant state's

attorney, and *Sandra L. Tullius*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Michael Kendall, appeals from the judgment of conviction, following a jury trial, of one count of capital felony in violation of General Statutes § 53a-54b (7), one count of capital felony in violation of General Statutes § 53a-54b (8), three counts of murder in violation of General Statutes § 53a-54a and one count of arson in the first degree in violation of General Statutes § 53a-111 (a) (1). The defendant was sentenced to a term of life imprisonment without the possibility of release. This appeal, originally filed in our Supreme Court, was transferred to this court by the Supreme Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. On appeal, the defendant claims that (1) he was deprived of his right to a fair trial as a result of numerous instances of prosecutorial impropriety, (2) the trial court abused its discretion in denying his motion for a competency evaluation, (3) the court improperly denied his *Batson*[1] challenges, (4) the court erred in allowing into evidence certain hearsay statements of a deceased person under the spontaneous utterance exception to the hearsay rule, (5) the court erred in instructing the jury on the credibility of witnesses and (6) the court erred in refusing to charge the jury on diminished capacity. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant. In December, 2003, the defendant lived at 42 Great Hill Road in East Hartford with his wife, Ramona Kendall and their two daughters, Kayla Kendall, who was sixteen years old, and Alexis Kendall, who was twelve years old. Ramona Kendall's father, Adam Alston, also

---

[1] See *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

was staying at the residence. The Kendalls' home was part of a row of six connected apartments. Katrea Anglin and Kiana Alston, daughters from Ramona Kendall's prior marriage, lived in a nearby apartment at 46 Great Hill Road.

The defendant and Ramona Kendall had a contentious relationship during their nineteen year marriage. During that time the defendant physically and emotionally abused her. He told friends that if Ramona Kendall ever left him, he would "take her out" and that "sometimes you feel like you want to kill your whole family." In 2003, Ramona Kendall pursued divorce proceedings against the defendant. As part of those proceedings, the court granted her exclusive use of the premises at 42 Great Hill Road, the defendant was ordered to leave the premises by December 13, 2003, and the children were to remain in the house. The defendant was upset with the court order and wanted to take his daughters with him.

On December 13, 2003, between 4 and 5 a.m., Anglin was awakened from sleep on the couch in her sister's apartment at 46 Great Hill Road by someone's banging on the front door. Kiana Alston, who had been asleep upstairs, also heard the banging and ran down the stairs to the front door. When Anglin opened the door, she saw Adam Alston wearing a thermal undershirt, unzipped pants and no shoes, despite the cold weather. He was shaking, crying and very upset. He stated: "Oh, Lord, oh, Lord, Michael done shot Mona and the kids and caught them on fire." Anglin immediately dialed 911.

Upon arriving at the scene, James Sopelak, a firefighter with the East Hartford fire department, observed flames coming from a second floor window of 42 Great Hill Road. After entering the apartment, Sopelak found a girl lying at the top of a landing on the stairs. Not

knowing whether the girl was alive, Sopelak carried her outside and placed her on the lawn. John Colli, a fire department engine company captain, checked for a pulse and determined that the girl, later identified as Alexis Kendall, was deceased. Firefighters Daniel Wasilewski and Richard Stepp then entered the apartment. Upon searching the front bedroom, Wasilewski discovered two more victims, later identified as Ramona Kendall and Kayla Kendall. Wasilewski discovered one victim by the bedroom door and the other near the front window of the bedroom. He concluded that neither victim was "viable" and left both bodies where he had found them.

Michael Laraia, an employee of the state fire marshal's office, investigated the cause and origin of the fire. On the basis of his investigation, he determined that the fire had two separate origins: the landing on the staircase where the first victim had been found and the front bedroom where the next two victims had been found. Laraia concluded that the cause was of "deliberate human hand and design." Forensic pathologists from the chief medical examiner's office performed autopsies, the results of which revealed that the cause of death of each victim was a gunshot wound to the head. The medical examiners opined that each victim died before the fire started. They based that determination on the lack of soot in the victims' airways and the lack of carbon monoxide in their blood.

Thereafter, the police attempted to locate the defendant. On January 12, 2004, Michael Allen, a Hartford police officer, responded to a call reporting that the defendant had been seen near Asylum Avenue. Allen found the defendant on a staircase inside an apartment building on Asylum Avenue. At the time of his arrest, the defendant had a fully loaded .38 caliber revolver in his left front pants pocket. The bullets recovered from the bodies of the victims were found to have been fired

from the handgun found in the defendant's possession at the time of his arrest. Also found on the defendant were newspaper obituaries for all three victims.

The defendant thereafter was charged, by way of long form information, with one count of capital felony in violation of § 53a-54b (7) for the murder of two or more persons at the same time or in the course of a single transaction, one count of capital felony in violation of § 53a-54b (8) for the murder of a person under sixteen years of age, three counts of murder and one count of arson in the first degree.

The defendant testified at trial. He denied killing the victims. According to the defendant, he was awakened on the morning in question by popping or crunching sounds. When he got up to investigate the sounds, he saw that the apartment was on fire and noticed a person lying at the top of a flight of stairs. He testified that he saw a gun, which he previously had found in his deceased uncle's clothing, at the bottom of the stairs. He took the gun and fled.

Following a jury trial, the defendant was convicted of all counts in the information. During the penalty phase, the jury found that the state had not proven an aggravating factor beyond a reasonable doubt. The defendant thereafter was sentenced to a total effective sentence of life imprisonment without the possibility of release for the capital felony charges[2] and a consecutive twenty-five year sentence on the arson charge. This appeal followed.

I

The defendant first claims that he was deprived of his right to a fair trial as a result of numerous instances of prosecutorial impropriety. We disagree.

---

[2] The court merged the conviction of the three counts of murder into the conviction of the two counts of capital felony.

To the extent that the defendant did not object to the improprieties at trial, he claims on appeal that such a failure to object does not preclude review of his claim. As our Supreme Court has recognized, "a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987)." *State* v. *Gould*, 290 Conn. 70, 77, 961 A.2d 975 (2009).[3]

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." (Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 275, 973 A.2d 1207 (2009). We will address the defendant's claims of prosecutorial impropriety in turn.

A

The defendant claims that throughout the trial, commencing with jury selection, the state attempted to inflame the passions of the jury by injecting emotion into the case. We are not persuaded.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the jury's attention from [its] duty to decide

---

[3] "This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors." (Internal quotation marks omitted.) *State* v. *Therrien*, 117 Conn. App. 256, 267, 978 A.2d 556, cert. denied, 294 Conn. 913, 983 A.2d 275 (2009).

the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Citation omitted; internal quotation marks omitted.) *State* v. *Mills*, 57 Conn. App. 202, 209, 748 A.2d 318, cert. denied, 253 Conn. 914, 915, 754 A.2d 163 (2000).

1

The defendant argues that the prosecutor committed impropriety during jury selection when she commenced her introduction of the state's witnesses with an exegesis of what she alleged the facts of the case to be, which practice the court curtailed. The prosecutor's comments, however, were not improper. During jury selection, the prosecutor presented the basic alleged facts of the case to venirepersons in order for them to determine whether they had personal knowledge of the case.[4] These comments did not constitute an improper appeal to the passions or emotions of the potential jurors. The tone of the comments appears to be quite neutral. Prior to the state's addressing the next panel

---

[4] The prosecutor stated in relevant part: "As far as the basic facts of this case, the state does allege that on or about December 13, 2003, [the] defendant . . . resided at 42 Great Hill Road, and that's in the town of East Hartford. That area of East Hartford is also known as Mayberry Village. [The defendant] resided there with his wife, Ramona Kendall, his sixteen year old daughter, Kayla Kendall, and his twelve year old daughter, Alexis Kendall. Also staying in the Kendall home on this date was Adam Alston, who was Ramona Kendall's seventy-three year old father. He was here for a visit from South Carolina. It's alleged that the defendant . . . pursuant to a court order, was to remove himself from 42 Great Hill Road on the morning of December 13, 2003. It's alleged that [at] approximately five in the morning on December 13, 2003, the defendant shot his wife, Ramona Kendall, in the head, and shot his sixteen year old and twelve year old daughters in the head, killing all three. It's further alleged that the defendant then set the apartment on fire where the three shooting victims were located. Adam Alston was able to escape the fire, and he alerted others in the row of apartments."

of venirepersons, the court reviewed the state's factual introduction, which the state had shortened, and did not find it objectionable.

### 2

The defendant also argues that the prosecutor committed impropriety when she "introduced, without objection, considerable irrelevant details of the victims' lives and background . . . ." The defendant's claim that the introduction of these details was inappropriate is purely evidentiary. The defendant did not object to the admission of the evidence at issue. "Although our Supreme Court has held that unpreserved claims of prosecutorial impropriety are to be reviewed under the *Williams* factors, that rule does not pertain to mere evidentiary claims masquerading as constitutional violations. . . . Evidentiary claims do not merit review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because they are not of constitutional magnitude. . . . [A] defendant may not transform an unpreserved evidentiary claim into one of prosecutorial impropriety to obtain review of the claim." (Citations omitted; internal quotation marks omitted.) *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007). We therefore decline to review this unpreserved evidentiary claim.

### 3

The defendant next claims that the prosecutor committed impropriety by seeking to introduce graphic photographs of the victims' charred bodies and graphic autopsy photographs. We are not persuaded.

In his appellate brief, the defendant draws our attention to the admission of the following exhibits. The state sought to admit into evidence a photograph of the body of Alexis Kendall after her body had been placed

outside the apartment. The state argued that the photograph was relevant to establish chain of custody. After defense counsel agreed to stipulate as to the chain of custody concerning a piece of that victim's clothing, which had tested positive for accelerant, the state argued that the photograph was also relevant to establish one of the elements of the crimes, namely, intent. The court overruled the defendant's objection, and thereafter the photograph was admitted into evidence as a full exhibit. The state subsequently introduced into evidence, as a full exhibit, a photograph depicting the charred bedroom where two bodies were found; only one body was visible in the photograph. The state also introduced, over the defendant's objection, autopsy photographs of the victims.

The defendant's claim is purely evidentiary. Although gruesome in nature, the photographs were relevant to the state's case. The defendant acknowledges in his brief that the court did not admit the most graphic photographs or ones that were repetitive. The defendant has not persuaded us that it was an abuse of the court's discretion to admit the photographs or that by seeking to admit these photographs into evidence, the prosecutor engaged in impropriety. See *State* v. *Boykin*, 83 Conn. App. 832, 839, 851 A.2d 384, cert. denied, 271 Conn. 911, 859 A.2d 570 (2004).

4

The defendant also argued that the state made several statements during closing argument that improperly aroused the passions and emotions of the jury. We are not persuaded.

In addressing this claim we first note that "a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Nonetheless, closing arguments often

have a rough and tumble quality about them, [and] some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Cromety*, supra, 102 Conn. App. 433–34.

First, the defendant argues that the prosecutor's statement that "[t]his twelve year old girl was on her hands and knees looking at her father when he pulled that trigger" was an emotional statement that was unjustified by the evidence in the case. This statement, however, finds support in the evidence. The evidence elicited at trial revealed that Adam Alston told Anglin that he saw one of his granddaughters "crawling on the floor" and saw the defendant light her on fire and shoot her. Adam Alston also heard one of his granddaughters say, "oh, daddy." We cannot say that the prosecutor's comment regarding Alexis Kendall's physical posture moments prior to her death impermissibly strayed beyond the evidence or the inferences the jury reasonably could have drawn from it.

Second, the defendant refers to the prosecutor's comments that the defendant set the victims' bodies on fire in order to make sure they were dead and that he "wasn't satisfied by merely killing [the victims], he had to obliterate them." In context, the prosecutor may have been suggesting that the defendant burned the victims because he wanted to cover up the crime and that he possessed the requisite intent to commit the crimes charged, or the prosecutor may have been suggesting that he was so angry that killing the victims was not enough. The prosecutor, however, was not appealing solely to the emotions of the jurors, but, rather, she

was making an argument that had a reasonable basis in the evidence.

Third, the defendant argues that the prosecutor repeatedly referred to the victims as "the girls the defendant claimed to love so much" and made other highly charged references. The prosecutor's comment regarding the victims was a reaction to the defendant's testimony that he loved his daughters and that he did not kill them. As an advocate, the prosecutor permissibly may "employ forceful arguments based upon the facts in evidence and the reasonable inferences drawn from such facts." (Internal quotation marks omitted.) *State v. Tate*, 85 Conn. App. 365, 374, 857 A.2d 394, cert. denied, 272 Conn. 901, 863 A. 2d 696 (2004). We cannot say that the prosecutor's argument strayed impermissibly beyond the evidence or the inferences that the jury reasonably could have drawn from it.

### B

The defendant's next claim of prosecutorial impropriety is that the prosecutor denigrated him and the defense case through the improper use of sarcasm during cross-examination of the defendant. The defendant claims that, as a result, he was deprived of his right to a fair trial. We are not persuaded.

"[A] prosecutor may not seek to sway the jury by unfair appeals to emotion and prejudice . . . and we have recognized that the excessive use of sarcasm may improperly influence a jury. . . . A prosecutor's frequent and gratuitous use of sarcasm can [call on] the jurors' feelings of disdain, and likely sen[d] them the message that the use of sarcasm, rather than reasoned and moral judgment, as a method of argument [is] permissible and appropriate for them to use. . . . A prosecutor should conduct his examination of a witness fairly, objectively and with decorum, and he should not ridicule or browbeat a witness. . . . Moreover, a

prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Finally . . . a prosecutor is not permitted to pose a question that implies the existence of a factual predicate when the prosecutor knows that no such factual basis exists." (Citations omitted; internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 564, 949 A.2d 1092 (2008). "[N]eedless sarcasm [is] inconsistent with [a] state's attorney's professional responsibility . . . ." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 261, 833 A.2d 363 (2003), quoting *Gore* v. *State*, 719 So. 2d 1197, 1201 (1998), aff'd after remand, 784 So. 2d 418 (Fla. 2001).

The defendant cites several instances of alleged sarcasm by the prosecutor. He argues that the prosecutor's sarcastic tone took the form of "you claim" questions, sarcastic repetitions of his answers and sarcastic exclamations of "lo and behold," "[g]ood luck for you," "just happened," "well, what way did you get up," "somehow that gun ends up," "just standing there placidly" and "daughters that you love so much." We do not determine whether any of these sarcastic remarks taken in isolation would have been improper. Rather, we are mindful of the likely cumulative effect that the prosecutor's repeated and excessive use of sarcasm had on the jury. See *State* v. *Rizzo*, supra, 266 Conn. 261. "[I]t is improper for a prosecutor to express his or her opinion, directly or indirectly, as to a defendant's guilt." *State* v. *Moore*, 65 Conn. App. 717, 724, 783 A.2d 1100, cert. denied, 258 Conn. 940, 786 A.2d 427 (2001).[5]

---

[5] We do not present in this case a searching analysis of why sarcasm is disfavored. In itself, it means little, and, as an advocacy tool, probably is counterproductive most of the time. Used improperly, however, it may, depending on context, convey the sense that the speaker has undisclosed knowledge of facts that render foolish the position of the person who is the object of the speaker's sarcasm; it implicitly may be presenting argument in the guise of a question; it may be injecting emotion unfairly. There may be other impermissible goals as well. We leave for another day an analysis of the underlying values served by disfavoring sarcasm.

The transcript[6] does not demonstrate necessarily that the prosecutor's use of the phrase "you claim" and repetitions of the defendant's answers were sarcastic. There is little indication that the state was doing anything other than confirming or clarifying the defendant's responses. See *State* v. *Chance*, 236 Conn. 31, 58, 671 A.2d 323 (1996) ("[c]ross-examination is the principal means by which the credibility of witnesses and the truth of their testimony is tested" [internal quotation marks omitted]).

The prosecutor's remarks "lo and behold," "[g]ood luck for you," and "just happened," occurred in the context of questioning the defendant regarding how he came to possess a loaded .38 caliber handgun. The defendant testified that he took clothes from the apartment of his deceased uncle and a handgun was inside the clothes. The prosecutor then asked: "So, you said I'll take the clothes and *lo and behold*, a gun just happened to be in them." (Emphasis added.) After the defendant answered affirmatively, the prosecutor then stated: "*Good luck for you.* And then you kept the gun." (Emphasis added.) The defendant again answered affirmatively. The defendant testified that he discovered the gun when it fell from the clothes onto the floor of his car. He stated that he found a box of bullets in the pocket of a suit that he had taken. The prosecutor then asked: "And the gun *just happened* to fall out of one of those pockets." (Emphasis added.) The defendant answered affirmatively. It is not entirely clear from the

---

[6] In its appellate brief, the state argues that the record was inadequate to review the defendant's claim of improper sarcasm in light of the fact that there are no rulings by the court pertaining to this issue because the defendant failed to object to the challenged remarks and because the record does not include an audible recording. In his reply brief, the defendant notes that he did provide us with an adequate record because an audible recording of the tone of the prosecutor's questions is available through the court reporter's office. In this case, the transcript provides an adequate record for our review.

transcript that the prosecutor was using these phrases in a sarcastic tone. See *State* v. *Rizzo*, supra, 266 Conn. 261 (noting sarcasm when transcript reveals phrases that could only have been said in sarcastic tones). It seems likely, however, that the "lo and behold" and "just happened" comments were stated in a sarcastic tone.

The state's remark, "[w]ell, what way did you get up," does not appear from the transcript to be sarcastic. The defendant testified that on the morning of December 13, 2003, he was awakened by crunching sounds. The prosecutor asked: "And you got up to investigate what those crunching sounds were." The defendant responded: "In a way, yes." Given the defendant's answer, the prosecutor asked: "In a way. *Well, what way did you get up*, sir?" (Emphasis added.) In asking the question, the prosecutor was seeking to have the defendant clarify his previous answer that he got up "[i]n a way." There is no indication that the prosecutor's remark was sarcastic.

The transcript also does not reveal that the state's remark, "somehow that gun ends up," was sarcastic. On cross-examination, the defendant testified that upon leaving the apartment he grabbed and took with him a gun, which he had not seen for a couple of days. He did not know whether it had been used. The prosecutor then asked: "*And somehow that gun ends up* with its shell casings removed in your home at 42 Great Hill Road on the morning of December 13 . . . fully loaded, with one extra bullet on you one month later. Isn't that right, sir?" (Emphasis added.) The defendant responded: "Yes." The prosecutor's remark was based on the evidence that the murder weapon was found, fully loaded, on the defendant at the time of his arrest, and the remark was relevant to his credibility regarding his statement that he did not know whether the weapon had been used. There is no indication from the transcript that this remark was sarcastic. See *State* v. *Coney*,

266 Conn. 787, 812, 835 A.2d 977 (2003) (credibility of defendant who testifies subject to scrutiny and close examination).

The defendant next takes issue with the prosecutor's comment that he was "just standing there placidly." On cross-examination, the defendant denied having struggled with the police during his arrest. He testified that an officer was trying to handcuff him but was unable to do so, not because he was struggling with the officer but, rather, because the officer had pushed him. The prosecutor then asked: "Were you *just standing there placidly*, put your hands behind your back and got handcuffed, sir?" (Emphasis added.) The defendant responded: "Well, he grabbed me, and I guess by me yanking, he pushed me down the stairs." The prosecutor, by asking whether the defendant was standing there placidly, was challenging the defendant's testimony that he was unable to be handcuffed because the officer had pushed him and not because the defendant was struggling with the officer.

We last turn to the prosecutor's comment regarding the defendant loving his daughters. On cross-examination, the defendant testified that after he woke up, he saw someone lying on the floor at the top of the stairs. The prosecutor then asked: "You didn't look to see if that *was one of these daughters that you loved so much?*" (Emphasis added.) This phrase may have been somewhat sarcastic, though it also had a foundation in the evidence.

Of the defendant's claimed instances of misconduct, only a limited number, as detailed previously in this subpart, amount to likely use of sarcasm, specifically the prosecutor's comment about the defendant's loving his daughters and the prosecutor's "lo and behold" and "just happened" comments. Even if we were to assume that these comments were said in a sarcastic tone, the

comments were isolated and limited. Accordingly, the state's use of this rhetorical device three times did not rise to the level of impropriety. "[O]ur Supreme Court has recognized that repetitive and excessive use of sarcasm is one method of improperly swaying the fact finder. . . . The use of sarcasm only once or twice does not, however, constitute such an appeal." (Citation omitted; internal quotation marks omitted.) *State* v. *Glenn*, 97 Conn. App. 719, 732, 906 A.2d 705 (2006) (state's limited use of sarcasm not improper), cert. denied, 281 Conn. 913, 916 A.2d 55 (2007); see also *State* v. *Boyd*, 89 Conn. App. 1, 41, 872 A.2d 477 (same), cert. denied, 275 Conn. 921, 883 A.2d 1247 (2005); cf. *State* v. *Spiegelmann*, 81 Conn. App. 441, 457–58, 840 A.2d 69 (improper to inject sarcasm in cross-examination), cert. denied, 268 Conn. 921, 846 A.2d 882 (2004). "Although we neither encourage nor condone the use of sarcasm, we also recognize that not every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *John M.*, 87 Conn. App. 301, 315, 865 A.2d 450 (2005), aff'd, 285 Conn. 822, 942 A.2d 323 (2008). The prosecutor's limited use of sarcasm was not improper.[7]

---

[7] To the extent that the prosecutor's use of sarcasm was improper, we fail to see how the state's use of sarcasm a few times during a lengthy two week trial deprived the defendant of his right to a fair trial in light of the factors enunciated in *State* v. *Williams*, supra, 204 Conn. 540, which include "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Salamon*, supra, 287 Conn. 566.

With respect to the *Williams* factors, the state's conduct was not invited by the defense, but it was not particularly severe or frequent when viewed in the context of the lengthy trial. The defendant did not object and failed to seek curative measures. With respect to centrality, how the defendant originally obtained the gun and whether he loved his daughters was not of particularly central importance to the case. At any rate, the state's case against the defendant was strong. The defendant was not deprived of his

## C

The defendant next claims that the prosecutor committed impropriety by making disparaging remarks directed toward defense counsel, the defendant and the defense case during rebuttal closing arguments.

## 1

The defendant claims that the prosecutor committed impropriety when she "repeatedly accused" defense counsel of "taking the jury as far away from the evidence as possible" and "trying to take [the jury] away from the evidence that really matters." (Internal quotation marks omitted.)

"It is improper for a prosecutor to denigrate the function of defense counsel. . . . [T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . It is proper for the prosecutor, however, to comment on matters that are directly related to the evidence and material to the issue of the defendant's guilt." (Citation omitted; internal quotation marks omitted.) *State* v. *Antonio A.*, 90 Conn. App. 286, 302, 878 A.2d 358, cert. denied, 275 Conn. 926, 883 A.2d 1246 (2005), cert. denied, 546 U.S. 1189, 126 S. Ct. 1373, 164 L. Ed. 2d 81 (2006).

According to *State* v. *Antonio A.*, supra, 90 Conn. App. 303, it is not improper for the state to distinguish the defendant's version of the facts from the state's version of the facts. In this case, the prosecutor, following the defendant's closing argument, was highlighting the difference between her version and the defendant's version of the facts and the inferences properly drawn

right to a fair trial. See *State* v. *Spiegelmann*, supra, 81 Conn. App. 457–58 (any impropriety that may have occurred from prosecutor's isolated use of sarcasm did not deprive defendant of right to fair trial); see also *State* v. *Salamon*, supra, 287 Conn. 566–69.

from those facts. The prosecutor's remarks did not impugn the integrity or institutional role of defense counsel and, thus, did not constitute impropriety.

2

The defendant next claims that the prosecutor denigrated him when she commented that he was "try[ing] to manipulate the outcome of this trial" and tailoring his testimony to fit the evidence.[8] We are not persuaded.

The prosecutor did not, as the defendant contends, denigrate the defendant during closing argument. It is perfectly proper to try to defeat an argument. In closing argument, the defendant highlighted the difference between the state's version of the facts and his version. The prosecutor commented that the defendant heard the evidence during trial and tailored his testimony accordingly. It is not improper for a prosecutor to call the jury's attention to the fact that the defendant had the opportunity to hear all the other witnesses testify and had the ability to tailor his testimony accordingly. *State* v. *Perez*, 78 Conn. App. 610, 628, 828 A.2d 626 (2003), cert. denied, 271 Conn. 901, 859 A.2d 565 (2004); see also *State* v. *Sells*, 82 Conn. App. 332, 341, 844 A.2d 235 ("[i]n a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue that one of the two sides is lying" [internal quotation marks omitted]), cert. denied, 270 Conn. 911, 853 A.2d 529 (2004).

---

[8] In context, the prosecutor commented during rebuttal closing argument: "This is the last step on [the defendant's] journey for control. He tried to control his wife, he tried to control his daughters and now he's trying to control the outcome of this case. He took the [witness] stand and told you his version of what he claimed happened in an effort *to try to manipulate the outcome of this trial.* He's trying to control even when he's testifying. Remember, the defendant sat here in this courtroom and listened to all of the evidence. . . . But when he gets up there, *he tailors his story to go and fit in somehow with the evidence that he sat here and listened to.*" (Emphasis added.)

3

The defendant also claims that the prosecutor denigrated the defense case by characterizing it, during rebuttal closing argument, as "ludicrous" and "incredulous [sic]." We are not persuaded.

To put the prosecutor's challenged remarks in context, the state commented during rebuttal argument in pertinent part: "And then the defendant himself wants you to believe this *ludicrous* scenario. He sees this flickering of fire at the top of the stairs. He sees a person [lying] on the floor, who coincidentally happens to be where Alexis [Kendall] is found. He doesn't even look to see who that person is. He doesn't even look to see where his wife is. He does look to see where [Adam Alston] is. He doesn't look to see where these two daughters are that he claims to have loved so much. He just runs away from the burning building. . . . And then this defendant wants you to believe the most *incredulous* statement of all. He has the obituaries [for the victims] out of the Hartford Courant on his person when he's caught on January 12, 2004, and then he claims, even though he's got those obituaries, he doesn't know they're dead." (Emphasis added.)

The prosecutor's use of rhetorical comments was not improper. The prosecutor was highlighting the inconsistencies in the defendant's testimony—first, that he loved his daughters but then did not try to save them from the fire, and second, that he was unaware that his wife and daughters were dead despite having on his person their obituaries. When read in context, the challenged remarks fell within the bounds of proper commentary on the defendant's theory of defense. See *State* v. *Jenkins*, 70 Conn. App. 515, 537–38, 800 A.2d 1200, cert. denied, 261 Conn. 927, 806 A.2d 1062 (2002); see also *State* v. *Long*, 293 Conn. 31, 38, 975 A.2d 660 (2009)

(prosecutor should not be put in rhetorical straight-jacket).

## D

The defendant next claims that the prosecutor committed impropriety by vouching for the credibility of witnesses. He focuses his argument on the prosecutor's statement during closing argument that there was "no credible evidence" that he had his personal belongings ready to leave on December 13, 2003. The defendant argues that because he had testified that he had his personal belongings ready to leave on that date, the prosecutor's comment impliedly suggested that his testimony was not credible.

"[I]t is improper for a prosecuting attorney to express his or her own opinion, directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . The prosecutor, however, is not barred from commenting on the evidence presented at trial or urging the jury to draw reasonable inferences from the evidence that support the state's theory of the case, including the defendant's guilt. It is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the [jury] might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Citations omitted; internal quotation marks omitted.) *State* v. *Long*, supra, 293 Conn. 38.

The prosecutor's comment was not improper. The prosecutor implicitly was arguing that the evidence

demonstrated that the defendant had not taken steps to pack his personal belongings, despite his testimony to the contrary. "[A] prosecutor may not interject personal opinion about the credibility or truthfulness of a witness, [but] he may comment on the credibility of the witness as long as the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 440, 902 A.2d 636 (2006); see also *State* v. *Wickes*, 72 Conn. App. 380, 389, 805 A.2d 142 (prosecutor entitled to argue that evidence shows defendant's testimony not credible), cert. denied, 262 Conn. 914, 811 A.2d 1294 (2002); cf. *State* v. *Cruz*, 71 Conn. App. 190, 206, 800 A.2d 1243 (improper for prosecutor to express personal opinion regarding credibility of witnesses), cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002). There was evidence to support the inference that the defendant's testimony in this regard was not credible. The evidence revealed the following: Shirley Pripstein, Ramona Kendall's divorce attorney, testified that she filed a motion for her client's exclusive use of the premises at 42 Great Hill Road, and that her motion was granted by the court, *Gruendel, J.*, and was to take effect on December 13, 2003. Anglin testified that despite the fact that the defendant was to leave the home on December 13, 2003, she was unaware of any steps made by the defendant to vacate the home. Kiana Alston testified similarly.

The defendant has failed to cite any acts of prosecutorial misconduct. Accordingly, his claim that misconduct deprived him of a fair trial fails.

II

The defendant next claims that the court abused its discretion in denying his motion for a competency evaluation. He argues that the court should have ordered a competency evaluation or, at a minimum, conducted a more extensive colloquy. We are not persuaded.

The following additional facts are relevant. On January 2, 2007, the day evidence was to start, defense counsel filed a motion for a competency evaluation. In support of the motion, defense counsel argued that the evidence of the defendant's guilt was overwhelming; the best possible outcome for the defendant was life imprisonment; the state would recommend life imprisonment if the defendant took legal responsibility for the victims' deaths;[9] defense counsel had extensive discussions with the defendant regarding the advisability of taking legal responsibility for the victims' deaths; from the perspective of defense counsel, the defendant is incapable of rationally dealing with his situation as it relates to either accepting legal responsibility or presenting an appropriate defense to the charges.

The court addressed the motion prior to the start of evidence. The court observed that the defendant was "looking a little surprised that . . . somebody thinks he's not competent." The court further observed that the defendant looked "as always, intelligent and competent to me, but I'm not an expert." The court thereafter canvassed the defendant as follows:

"The Court: Do you understand what we're doing here today?

"[The Defendant]: My understanding is that he want me to plead—

"The Court: Yes, but don't tell me the deal.

"[The Defendant]: Okay.

"The Court: And you don't want to plead.

"[The Defendant]: No.

---

[9] The court stated to counsel prior to argument on the motion that it did not read the portion of the motion regarding the details of the plea deal because if the defendant were convicted of noncapital crimes it would be the sentencing court.

"The Court: Okay. Do you understand that the state has the burden of proof to prove guilt, if it can, by evidence beyond a reasonable doubt?

"[The Defendant]: Yes.

"The Court: And you want your trial.

"[The Defendant]: Yes.

"The Court: Okay. Do you have a sense as to what it is that my job is?

"[The Defendant]: Yeah.

"The Court: What is it?

"[The Defendant]: Your job is, you the judge, so—

"The Court: I know, but say a little more.

"[The Defendant]: Well, you the one to oversee what's going on here in this court—

"The Court: Okay.

"[The Defendant]:—do I get a fair trial.

"The Court: Very good. Okay. The motion for an order to evaluate the defendant's competence is denied."

When asked if he had anything further to say, defense counsel noted that the court's inquiry did not address the reasons why defense counsel believed that the defendant was not competent. Defense counsel argued that the defendant believes in God and believes that he could not have committed the crimes because he loves his daughters. Further, he argued that the defendant believes that divine intervention can occur at trial so as to produce evidence of his innocence. Defense counsel noted that in his opinion, the defendant's belief in divine intervention was a "delusion . . . ."

The court noted that the test for competency is whether the accused is able to understand the nature of

the proceedings against him, participate meaningfully in his own defense and cooperate with counsel. The court stated: "I've ordered a lot of competency evaluations, and I've talked to a lot of people whose competency was clearly questionable, but [the defendant] is not one of those people." The court reiterated that the motion was denied.

"As a matter of constitutional law, it is undisputed that the guilty plea and subsequent conviction of an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. . . . This constitutional mandate is codified in our state law by [General Statutes] § 54-56d (a), which provides that [a] defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense. . . . General Statutes § 54-56d (b), however, posits a presumption in favor of a defendant's competence." (Citations omitted; internal quotation marks omitted.) *State* v. *Monk*, 88 Conn. App. 543, 548, 869 A.2d 1281 (2005). Every criminal defendant is presumed to be competent. General Statutes § 54-56d (b). During the course of the criminal proceedings, however, if it appears that the defendant is not competent, either party or the court may request an examination to determine the defendant's competency. General Statutes § 54-56d (c).

"The provisions of § 54-56d state that if it appears that the defendant is not competent, and if the trial court finds that a request for a competency evaluation is justified, the court must order a competency examination. We have interpreted this standard as requiring a competency evaluation any time a reasonable doubt is raised regarding the defendant's competency. . . . To establish such reasonable doubt, the defendant must

present substantial evidence, not merely allegations, that he is incompetent. . . . Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Ross*, 269 Conn. 213, 272, 849 A.2d 648 (2004).

We review the court's ruling on a motion for a competency evaluation under the abuse of discretion standard. *State* v. *Collazo*, 113 Conn. App. 651, 662, 967 A.2d 597, cert. denied, 293 Conn. 904, 976 A.2d 705 (2009). "In determining whether the trial court [has] abused its discretion, this court must make every reasonable presumption in favor of [the correctness of] its action. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Internal quotation marks omitted.) *State* v. *Williams*, 65 Conn. App. 59, 84, 782 A.2d 149, cert. denied, 258 Conn. 923, 782 A.2d 1251 (2001).

The court did not abuse its discretion in denying the defendant's motion for a competency evaluation because it was reasonable for it to have concluded that the defendant had failed to raise a reasonable doubt about his competency. After defense counsel brought his § 54-56d motion, the court canvassed the defendant about his understanding of the proceedings against him and his understanding of the plea bargain. The canvass revealed that the defendant understood that defense

counsel wanted him to plead guilty but that the defendant wanted a jury trial.[10] It also revealed that he understood that the state had the burden of proving his guilt beyond a reasonable doubt. The court was not required to conduct a more extensive colloquy.[11] The canvass supported a finding of competency. "Connecticut appellate courts have repeatedly held that a trial court may not be required to order a competency examination when the defendant's canvass supports a finding of competency." *State* v. *Silva*, 65 Conn. App. 234, 249, 783 A.2d 7, cert. denied, 258 Conn. 929, 783 A.2d 1031 (2001).

The defendant argues, however, that the court's canvass failed to address the defendant's firmly held "delusion" that divine intervention would occur during trial and that it would come to light that he was innocent.

---

[10] The defendant's decision to proceed to trial, despite defense counsel's belief that to do so was not in the defendant's best interest, is not evidence of incompetence. See *Jarrett* v. *Commissioner of Correction*, 108 Conn. App. 59, 73, 947 A.2d 395 ("courts may not construe a defendant's decision to proceed to trial as evidence of incompetence merely because others conclude the decision is not in the defendant's best interest"), cert. denied, 288 Conn. 910, 953 A.2d 653 (2008).

[11] To the extent that the defendant also is claiming that the court should have conducted an evidentiary hearing, his claim fails because he did not present substantial evidence of mental impairment. "[T]he rule of *Pate* v. *Robinson* [383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)] imposes a constitutional obligation, under the due process clause, to undertake an independent judicial inquiry, in appropriate circumstances, into a defendant's competency to stand trial . . . . When a *Pate* inquiry is required, a court may not rely on the defendant's subjective appraisal of his own capacity or on the court's personal observations of the defendant but must hold an evidentiary hearing into the defendant's competence. . . . Competence to stand trial is a legal question, which must ultimately be determined by the trial court. . . . The decision to grant [an evidentiary] hearing [into a defendant's competence] requires the exercise of sound judicial discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Cuesta*, 68 Conn. App. 470, 481–82, 791 A.2d 686, cert. denied, 260 Conn. 914, 796 A.2d 559 (2002). "The trial court should carefully weigh the need for a hearing in each case, but this is not to say that a hearing should be available on demand. The decision whether to grant a hearing requires the exercise of sound judicial discretion." (Internal quotation marks omitted.) *State* v. *Johnson*, 253 Conn. 1, 22, 751 A.2d 298 (2000).

He contends that the court should have ordered a competency evaluation because the defendant's "delusion" raised a reasonable doubt regarding his competency. Following the canvass, defense counsel discussed with the court the issue that the defendant believed that divine intervention would occur during trial. The court noted that it was defense counsel's "opinion" that the defendant's belief in divine intervention was a "delusion . . . ." The court further noted that it has ordered many competency evaluations and "talked to a lot of people whose competency was clearly questionable, but [the defendant] is not one of those people." The court apparently determined that the defendant's belief in divine intervention did not create a reasonable doubt as to the defendant's competency. In this case, such a determination cannot be said to be an abuse of discretion. See *Higgenbottom* v. *United States*, 923 A.2d 891, 897 n.4 (D.C. 2007) (defendant's belief in divine intervention consistent with that of many competent persons).[12]

The defendant draws attention to the fact that approximately two weeks prior to his making the motion, the court was made aware of his mental health history. On December 19, 2006, the court and counsel engaged in a discussion regarding one of the defendant's proposed mitigating factors: "an underlying mental health condition that cannot be diagnosed at this time." During this discussion, defense counsel noted that the defendant had been seen by mental health professionals within the department of correction. The defendant did

---

[12] The record shows only that the defendant's attorney urged that the defendant hoped for or was expecting "divine intervention." Even if we were to agree, in this secular age, that divine intervention was not a realistic prospect, the functional difference between a hope for divine intervention in itself and a hope for an improbable result is minimal. A defendant may hope for a favorable verdict contrary to a mass of evidence and not be incompetent solely by virtue of the hope. Competent people can make choices that turn out to be poor.

not raise this issue when arguing his motion for a competency hearing or offer any additional insight into any underlying mental health condition. Even if true, the fact that the defendant had seen mental health professionals but has not been diagnosed does not necessarily raise a reasonable doubt as to the defendant's competency. See *State* v. *Ross*, supra, 269 Conn. 272 (to establish reasonable doubt defendant must present substantial evidence, not merely allegations of incompetence). Indeed, the suggestion that the defendant had seen a mental health professional and the concomitant failure to produce evidence from the professional do not raise a reasonable doubt regarding competence to stand trial. The defendant has not met his burden of showing that, at the time of the denial of his motion for a competency examination, the court had before it specific factual allegations that, if true, would constitute substantial evidence of mental impairment. See *State* v. *Johnson*, 22 Conn. App. 477, 488, 578 A.2d 1085 (discussing defendant's burden), cert. denied, 216 Conn. 817, 580 A.2d 63 (1990). The record reveals no abuse of the court's discretion.

## III

The defendant next claims that the court improperly denied his claim that the state, during jury selection, exercised two peremptory challenges in a racially discriminatory manner. He argues that the court improperly permitted the state to exercise two of its peremptory challenges to remove two African-American venirepersons, G.C. and B.D.,[13] from the jury, thereby depriving him of a fair trial in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We are not persuaded.

---

[13] References to venirepersons will be made by use of initials to protect their legitimate privacy interests. See, e.g., *State* v. *Wright*, 86 Conn. App. 86, 88 n.3, 860 A.2d 278 (2004).

We begin by setting forth the relevant legal principles and the standard of review. "In *Batson* [v. *Kentucky*, supra, 476 U.S. 79] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not

related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. . . . As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it

. . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Holloway*, 116 Conn. App. 818, 822–24, 977 A.2d 750, cert. denied, 294 Conn. 902, 982 A.2d 646 (2009).

A

During voir dire, B.D. revealed that she had a bachelor's degree in chemistry, lived with her mother and had worked at a CVS pharmacy for approximately seven years. She also stated that her boyfriend recently had been arrested and was in jail for possessing a revolver, which crime she believed he did not commit. She further revealed that her cousin was murdered in North Carolina when he was seventeen. The murderer was never found.

The state exercised a peremptory challenge excusing B.D. The defendant objected. The court recognized that B.D. had indicated on her questionnaire that she was African-American. The state then gave the following reasons in support of its use of a peremptory challenge as to B.D.: she was only twenty-three years of age and demonstrated an extreme lack of maturity; her boyfriend had a pending criminal charge against him involving the use of a weapon; and, the state added, the murder of her cousin in North Carolina remained unsolved. Defense counsel argued that despite her age, B.D. had worked for the past seven years and had substantial career plans, and that although the issue with B.D.'s boyfriend could have formed a neutral reason for the state to excuse her, B.D. believed that she could keep that factor separate from the case. The court found the state's reasons for its peremptory challenge to be race neutral. The court noted that the difference in the maturity level of B.D. as compared to similarly aged jurors was "startling."

We conclude that the court's rejection of the defendant's *Batson* challenge was not clearly erroneous. One of the reasons given by the state was lack of maturity. B.D. was twenty-three years old. Despite being a college graduate, she had worked at only one place and lived at home with her mother. Lack of maturity is a race neutral reason. *State* v. *McDougal*, 241 Conn. 502, 512–20, 699 A.2d 872 (1997) (peremptory challenges based on youth permissible); see also *State* v. *Hodge*, 248 Conn. 207, 257, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). A second reason given by the state was that B.D.'s boyfriend had a pending criminal case against him, which involved possession of a weapon. B.D. believed her boyfriend to be innocent. "Courts consistently have upheld the use of peremptory challenges to excuse a venireperson with a close relative who has been prosecuted because of the real possibility that the venireperson may harbor resentment against prosecuting authorities generally." (Internal quotation marks omitted.) *State* v. *Jackson*, 95 Conn. App. 400, 410, 896 A.2d 137, cert. denied, 279 Conn. 904, 901 A.2d 1226 (2006). Another reason given by the state was the unsolved murder of B.D.'s cousin. This was a race neutral ground for excusing her. "Prosecutors commonly seek to exclude from juries all individuals, whatever their race, who have had negative encounters with the police because they fear that such people will be biased against the government." (Internal quotation marks omitted.) *State* v. *Kalican*, 110 Conn. App. 743, 759, 955 A.2d 1261, cert. denied, 289 Conn. 949, 960 A.2d 1038 (2008). These reasons individually and collectively support the state's peremptory challenge of B.D.

In further support of his claim that the state discriminated against B.D. because of her race, the defendant argues that persons with similar characteristics but not the same race as B.D. were not struck. In response, the

state argues, citing *State* v. *Hodge*, supra, 248 Conn. 207, that the defendant's argument fails because the failure "to strike a white juror who shares some traits with a struck black juror does not itself automatically prove the existence of discrimination." (Internal quotation marks omitted.) Id., 237. In his reply brief, the defendant argues that the state's reliance on this holding in *Hodge* is misplaced because the recent United States Supreme Court case of *Snyder* v. *Louisiana*, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008),[14] overrules cases such as *State* v. *Hodge*, supra, 207.

In *Snyder*,[15] the court held that the prosecutor's proffered explanation for striking the venireperson at

[14] The defendant also relies on *Miller-El* v. *Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (prosecutor's race neutral reasons for strikes pretextual where reasons at odds with evidence, prosecutor struck ten of eleven qualified black venire members and selection process replete with evidence that prosecutor rejected jurors on the basis of race), and *Johnson* v. *California*, 545 U.S. 162, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005) (holding California's "more likely than not" standard inappropriate as to *Batson*'s first prong to measure sufficiency of prima facie case of purposeful discrimination), to support his claim. Neither of these cases changes our analysis in this case.

[15] In *Snyder*, the Supreme Court made comparisons between one of the stricken minority venirepersons and several nonminority venirepersons who were accepted and concluded that based on the comparison, the state's race neutral reason was pretextual. The prosecutor offered two race neutral reasons for using a peremptory challenge on venireperson Brooks, a college senior who was attempting to fulfill his student-teaching obligation, in response to defense counsel's *Batson* challenge. *Snyder* v. *Louisiana*, supra, 552 U.S. 477–78. Because of a lack of factual findings by the trial court regarding the state's first explanation, nervousness, the court focused on the state's second explanation. Id., 479. The second proffered explanation was that Brooks, as a student teacher, might be inclined to come back with a lesser verdict so as to avoid a penalty phase and thus return home quickly. Id., 478. When Brooks' schedule conflict became apparent during voir dire, the court instructed a law clerk to telephone a dean of the university Brooks was attending. Id., 481. The telephone call revealed that the dean would work with Brooks and did not foresee a problem so long as it was just for that week. Id. Because the prosecutor anticipated, during voir dire, that the trial would be brief and thus serving on a jury would not have seriously interfered with Brooks' student teaching obligation, the United States Supreme Court noted that the proffered explanation was suspicious. Id.,

issue—scheduling conflicts—was suspicious because serving on a jury would not have interfered seriously with the venireperson's other obligations and was implausible because the prosecutor accepted white jurors who disclosed conflicting obligations that appeared to have been at least as serious as those of the venireperson at issue. *Snyder* v. *Louisiana,* supra, 552 U.S. 479–86. The court stated that "[t]he prosecution's proffer of this pretextual explanation naturally gives rise to an inference of discriminatory intent." Id., 485. The court further noted that in light of the fact that the trial judge made no findings regarding the prosecutor's other proffered explanation—the venireperson's nervousness—the record did not show that the prosecution would have preemptively challenged the venireperson at issue based on his nervousness alone. Id. This case is not at odds with our Supreme Court's holding in *State* v. *Hodge,* supra, 248 Conn. 237, that the failure "to strike a white juror who shares some traits with a struck black juror does not itself automatically prove the existence of discrimination." (Internal quotation marks omitted.)

In the present case, the defendant argues that the state's discriminatory intent is demonstrated by the fact that the state had accepted venireperson C.R., a nonblack juror, despite her having been arrested. C.R. indicated that it was a misdemeanor offense for which she received accelerated rehabilitation. C.R.'s offense was not of a serious nature, but the offense involving B.D.'s boyfriend involved a weapons charge, of which B.D. believed that her boyfriend was innocent. In light of the fact that the defendant was charged with three fatal

482–83. The court noted that the "implausibility of [the prosecutor's second] explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as . . . Brooks'." Id., 483. The court stated that "[t]he prosecution's proffer of this pretextual explanation naturally gives rise to an inference of discriminatory intent." Id., 485. The court reversed on this basis. Id., 485–86.

shootings, it would be reasonable for the prosecutor to have been concerned that the charges against B.D.'s boyfriend could affect her ability to be a fair and impartial juror. The defendant also argues that the state's contention that B.D. lacked maturity is pretextual because the state accepted as jurors J.B. and E.G., who were twenty-six and twenty-three years old, respectively. The court compared B.D.'s maturity level with the twenty-six and twenty-three year old jurors and noted that the difference in maturity level was "startling."

Accordingly, we conclude that the court's rejection of the defendant's *Batson* challenge was not clearly erroneous. "[T]he fact-bound determination concerning the propriety of the use of peremptory challenges is a matter that necessarily must be entrusted to the sound judgment of the trial court, which, unlike an appellate court, can observe the attorney and the venireperson and assess the attorney's proffered reasons in light of all the relevant circumstances." *State* v. *Hodge*, supra, 248 Conn. 261. Here, the court determined that the reasons offered by the prosecutor for striking B.D. were race neutral. We conclude that the court properly determined that the state had not exercised its peremptory challenge in a racially discriminatory manner.

B

During the state's questioning of G.C. on voir dire, G.C. revealed that he had worked with the department of correction (department) for approximately twelve years as a correction officer and had worked with death row inmates. He declined to discuss why he left the department, citing a nondisclosure agreement. G.C. also revealed that his niece and three of his brothers have been incarcerated. The state twice asked G.C. if he would be able to follow the court's instructions even if he were to disagree with them. Both times, G.C.

answered that he "would have to go with [his] feelings." When the state asked if he would hold the state to a burden of proof that is higher than the beyond a reasonable doubt standard because this is a capital felony case, G.C. responded affirmatively. In both instances, the court rehabilitated G.C.

Following defense counsel's questioning of G.C., the state exercised a peremptory challenge to remove G.C. Defense counsel raised a *Batson* challenge. The state then articulated, inter alia, the following reasons in support of its peremptory challenge: G.C. was a correction officer who had worked with death row inmates but was not permitted to discuss why he left because of a nondisclosure agreement; three of G.C.'s brothers and his niece had been incarcerated; and G.C., prior to rehabilitation, indicated that he would not necessarily follow the court's instructions and that he would hold the state to a higher burden of proof than legally required. In response, defense counsel argued that the state spent more time questioning G.C. about his personal life experiences than it had with other jurors it had accepted and that G.C.'s responses were reasonable.

The court found that the state's reasons for exercising the peremptory challenge were "completely race neutral." The court noted that the reason for the length of the state's voir dire of G.C. was due to the court's rehabilitating him and G.C.'s "voluminous answers." The court observed that the state's questions were the same as it had used for other venirepersons. The court further noted that G.C.'s nondisclosure agreement with the department of correction was "remarkable." The court summarized that G.C. was a correctional officer who left after twelve years with a nondisclosure agreement regarding the reasons for the departure, has three siblings and a niece incarcerated and initially gave troublesome answers to questions regarding the burden of proof and following the court's instructions. The

court concluded that "[a]ll of those reasons are race neutral . . . and I find that . . . there is no racial motive to the challenge that has been exercised."

We conclude that the court's rejection of the defendant's *Batson* challenge was not clearly erroneous. G.C. had worked for the department for twelve years and had worked with death row inmates during that time. Due to a nondisclosure agreement, which the court found "remarkable," G.C. refused to reveal any details regarding his work as a correctional officer or his reasons for leaving. This reason alone was a constitutionally acceptable ground for his excusal. "[P]eremptory challenges based on employment reasons have been upheld." (Internal quotation marks omitted.) *State* v. *Collazo*, 115 Conn. App. 752, 764, 974 A.2d 729 (2009), cert. denied, 294 Conn. 929, 986 A.2d 1057 (2010). Additionally, the state reasoned that G.C. had three brothers and a niece who had been incarcerated. "[C]ourts consistently have upheld the use of peremptory challenges to excuse a venireperson with a close relative who has been prosecuted because of the real possibility that the venireperson may harbor resentment against the prosecuting authorities generally." (Internal quotation marks omitted.) *State* v. *Kalican*, supra, 110 Conn. App. 759. Last, when the state asked if he would follow the court's instructions even if he disagreed with them, G.C. indicated that he "would have to go with [his] feelings." He also indicated that he would hold the state to a higher burden of proof because this was a capital felony case and would require absolute certainty. Although the court rehabilitated G.C. on both issues, "a prosecutor is not bound to accept the venireperson's reassurances but, rather, is entitled to rely on his or her own experience, judgment and intuition in such matters. . . . [E]quivocation with respect to holding the state to a higher burden of proof than proof beyond a reasonable doubt . . . [is a] valid, nondiscriminatory [reason] for

excusing [the venireperson]." (Citation omitted; internal quotation marks omitted.) *State* v. *Acosta*, 119 Conn. App. 174, 186, 988 A.2d 305, cert. denied, 295 Conn. 923, 991 A.2d 568 (2010).

The defendant further argues that the state's discriminatory intent is demonstrated by the fact that the state has accepted venirepersons who had former or pending charges against themselves or relatives. As to the latter, the fact that the state accepted other venirepersons who were not black and who shared a similar trait with G.C., does not automatically prove the existence of discrimination. See *State* v. *Hodge*, supra, 248 Conn. 237 (failure to strike white juror who shares some traits with struck black juror does not automatically prove existence of discrimination). Furthermore, the state also accepted an alternate venireperson, who in the opinion of the court was African-American, who had been arrested for breach of the peace and who had a brother who had been arrested for rape. This undercuts the defendant's claim of purposeful discrimination. See id., 260.

The defendant also argues that state's discriminatory intent is demonstrated by the fact that the state accepted at least two venirepersons who had connections to the department: one whose husband and son had worked for the department and another whose husband worked for the department. G.C. was unique in that despite having worked for the department for twelve years and having worked with death row inmates, he was unable to reveal any details regarding his work as a correctional officer or his reasons for leaving due to a nondisclosure agreement. The court noted that such an agreement was "remarkable."

We conclude that the court's rejection of the defendant's *Batson* claim with respect to G.C. was not clearly erroneous.

## IV

The defendant next claims that the court erred in admitting into evidence certain hearsay statements of a deceased person under the spontaneous utterance exception to the hearsay rule. We disagree.

Anglin testified during direct examination by the state that Adam Alston, her maternal grandfather, was "banging" on her door in the early morning hours of December 13, 2003. She observed that Adam Alston was wearing a thermal undershirt, unzipped pants and no shoes, despite the cold weather. She further observed that he "was shaking . . . crying [and] seemed very upset, in shock. He wasn't himself." When the state asked Anglin what Adam Alston then said to her, defense counsel objected, and the jury was excused. Anglin noted, when asked by the court, that Adam Alston had repeated the phrase: "Oh, Lord, oh, Lord, Michael done shot Mona and the kids and caught them on fire." Adam Alston died prior to trial. The state sought to introduce the statements Adam Alston had made shortly after the homicides under the spontaneous utterance exception to the hearsay rule. Defense counsel argued that the spontaneous utterance exception did not apply because the state had failed to establish that Adam Alston had an opportunity to observe anything other than the aftermath of what had occurred. The state noted that Adam Alston had told Anglin that he had seen one of his granddaughters crawling on the floor and then saw the defendant light her on fire and shoot her and that he had to step over his granddaughter's burning body to come down the stairs. The court overruled the defendant's objection and concluded that it was a reasonable inference that Adam Alston had witnessed what he had reported.

Anglin thereafter testified that when Adam Alston arrived at her door, he stated: "Oh, Lord, oh, Lord,

Michael done shot Mona and the kids and caught them on fire." She additionally testified that Adam Alston said that he had heard several popping sounds, saw one of his granddaughters crawling on the floor and saw the defendant set her on fire and shoot her. According to Anglin, Adam Alston said that to exit Ramona's apartment and get help, he had to climb over the burning body of one of his granddaughters.

"The excited utterance exception is well established. Hearsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. . . . Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unreasonable exercise of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 109 Conn. App. 187, 193, 951 A.2d 31, cert. denied, 289 Conn. 929, 958 A.2d 160 (2008); see also Conn. Code Evid. § 8-3 (2). "[T]he state is not required to establish such personal observation by the declarant beyond any possible doubt. Rather, the question for the trial court is whether a reasonable inference may be drawn that the declarant had personal knowledge of the facts that are the subject of his or her statement. . . . Consequently, [d]irect proof of observation is not necessary; if the circumstances appear consistent with opportunity [to observe] by the declarant, the requirement is met." (Citations omitted; internal

quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 128–29, 763 A.2d 1 (2000).

The defendant challenges the third requirement and argues that the state failed to establish that Adam Alston had the opportunity to observe the occurrence. He further argues that Adam Alston's statement to the police suggested that he had not seen the defendant shoot the victims or ignite their bodies but, rather, that he left without seeing the shootings.[16] He further notes that the medical examiner, who conducted an autopsy on the victim found in the hallway, Alexis Kendall, testified that because the victim had no soot or carbon monoxide in her lungs, the best explanation would be that the victim died before the fire was set or very rapidly afterward.

The court reasonably could have determined that the state adduced sufficient evidence to demonstrate that Adam Alston's statements logically could have resulted from his firsthand observations of the incident. According to Anglin, Adam Alston was "banging" on her door on the morning in question. He appeared disheveled with unzipped pants and without shoes and appeared very upset. He said that he had seen one of his granddaughters crawling on the floor, saw the defendant set her on fire and shoot her, and further explained that he had to climb over the burning body

---

[16] Adam Alston's statement to the police, which was admitted as a full exhibit at trial states in part: "On [December 12, 2003], I went to bed about eight p.m. At this time, Ramona [Kendall], [the defendant], Kayla [Kendall], and Alexis [Kendall] were all home. Between four a.m. and five a.m., I woke up and went to the bathroom. I returned to my room and closed the door. I then heard loud popping noises, and one of the kids say, 'Oh, Daddy.' I thought someone was shooting a gun outside the house. I put my pants on. I opened my bedroom door, and I saw one of the kids on the floor in the hallway. I walked into the hallway, and I suddenly saw that the child in the hallway was on fire. I began to walk down the stairs, and I called for [the defendant]. I went out the front door, and I walked to my granddaughter Kiana Alston's house, and I told her the house was on fire."

of one of his granddaughters to exit the apartment. A reasonable inference may be drawn that Adam Alston had personal knowledge of the facts that are the subject of his statement. See *State* v. *Wargo*, supra, 255 Conn. 129. The defendant's argument that Adam Alston did not have firsthand knowledge of the events because his statements to Anglin contradict his statement to the police and the medical examiner's testimony is unavailing. The fact that his spontaneous utterances may be inconsistent with other testimony affects the weight of Adam Alston's statements, not their admissibility.[17]

The defendant additionally argues that the court improperly admitted Adam Alston's statements to Anglin because the prejudicial impact of the statements outweighs the probative value. He argues that Adam Alston's descriptions that one of the victims was on her hands and knees when the defendant first shot her and lit her on fire unnecessarily aroused the emotions of the jury particularly in light of the fact that Adam Alston was not available for cross-examination. We are not persuaded.

"[R]elevant . . . evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . [Accordingly] [t]he test for determining whether

_____

[17] There may be some situations in which incontrovertible extrinsic evidence renders direct observation by the declarant impossible. This is not such a situation. Even if the extrinsic evidence is fully credited, then Adam Alston was mistaken in some details. The extrinsic evidence is not necessarily inconsistent with Adam Alston's presence at the scene or with his ability to make firsthand observations.

evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]." (Citations omitted; internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 544, 821 A.2d 247 (2003); see also Conn. Code Evid. § 4-3.

Adam Alston's statements were relevant to establish the events that occurred on the night in question. He was the only living eyewitness, other than the perpetrator, after the incident occurred. The defendant was able to cross-examine Ellen Stoldt, the detective who took Adam Alston's statement, and Anglin regarding the circumstances surrounding Adam Alston's statements to them. Although we do not doubt that Adam Alston's statements were damaging to the defendant, we cannot say that that evidence was unfairly prejudicial such that the court lacked discretion to admit it.

V

The defendant, who testified at trial, claims that the court erred in instructing the jury on the credibility of witnesses by indicating that the defendant's interest in the outcome of the case could be considered in evaluating his testimony.[18] The defendant seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40,[19] of his

---

[18] The court instructed the jury in relevant part: "[T]he defendant in this case took the [witness] stand and testified. In weighing the testimony of an accused person, you should apply the same principles by which the testimony of other witnesses is tested, and that necessarily involves a consideration of [the defendant's] interest in the outcome of the case. You will consider the importance to him of the outcome of the trial. An accused person, having taken the witness stand, stands before you, then, just like any other witness, and is entitled to the same consideration and must have his testimony measured in the same way as any other witness, including his interest in the verdict you're about to render."

[19] *State* v. *Golding*, supra, 213 Conn. 239–40, holds that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all of the following conditions are met*: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and

unpreserved claim. The defendant's claim is reviewable under *Golding* because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Mack*, 197 Conn. 629, 637, 500 A.2d 1303 (1985).

"Connecticut appellate courts repeatedly have held that a court's instruction that the jury evaluate the defendant's testimony in the same manner as that of any other witness after pointing out the defendant's interest in the outcome is neither improper nor transcends the bounds of evenhandedness." *State* v. *Mann*, 119 Conn. App. 626, 637, 988 A.2d 918 (2010). "[Our Supreme Court in *State* v. *Williams*, 220 Conn. 385, 396–97, 599 A.2d 1053 (1991)], relying on its precedent in *State* v. *Mack*, [supra, 197 Conn. 629], and *State* v. *Avcollie*, 188 Conn. 626, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983), held that the trial court's reference to the defendant's interest in the outcome of the trial did not deprive him of a fair trial." *State* v. *Elson*, 116 Conn. App. 196, 221, 975 A.2d 678 (2009).

In his brief, which originally was filed in the Supreme Court prior to the case being transferred to this court, the defendant essentially seeks to have this precedent overruled on the basis of several federal and out-of-state cases. At oral argument, the defendant noted that although he was not waiving this claim, he nevertheless recognized that we, as an intermediate appellate court, are bound by the decisions of our Supreme Court and are not at liberty to contradict those decisions. See *State* v. *Colon*, 71 Conn. App. 217, 245–46, 800 A.2d 1268 ("[w]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them" [internal quotation marks omitted]), cert. denied, 261

---

(4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.)

Conn. 934, 806 A.2d 1067 (2002). In light of *Williams* and its progeny, the defendant's claim fails under the third prong of *Golding*. It was not improper for the court to mention in its charge the defendant's interest in the outcome of the case and it did not unduly emphasize the defendant's interest. Accordingly, the defendant's claim fails under the third prong of *Golding*.

## VI

The defendant next claims that the court erred in refusing to charge the jury on diminished capacity. We disagree.

"A fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . . [A] defendant is entitled to have the court present instructions to the jury relating to any theory of the defense for which there is any foundation in the evidence, even if weak or incredible. . . . We must consider the evidence presented at trial in the light most favorable to supporting the defendant's request to charge. . . . An instruction on a legally recognized theory of defense, however, is warranted only if the evidence indicates the availability of that defense. . . . The trial court should not submit an issue to the jury that is unsupported by the facts in evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Adams*, 225 Conn. 270, 283, 623 A.2d 42 (1993).

Following the filing of the defendant's request to charge on diminished capacity, the court, at the charging conference, "decline[d] the defense request to charge on diminished capacity because there [was] no evidence of diminished capacity."

In his request to charge, the defendant did not state what evidence had been presented at trial to support

his request.[20] We note that in failing to cite to any evidence in his request to charge, the defendant did not comply with Practice Book § 42-18 (a), which provides in relevant part: "When there are several requests, they shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based, and the evidence to which the proposition would apply. . . ." To the extent that the court's decision could be construed to mean that it denied the defendant's request on this basis, it would not have been an abuse of discretion for the court to have done so.[21] See *State* v. *Bettini*, 11 Conn. App. 684, 690, 528 A.2d 1180 ("[i]n the absence of compliance with the rules of practice, the trial court is entitled to deny a request to charge"), cert. denied, 205 Conn. 804, 531 A.2d 937 (1987).

Furthermore, even if we were to review this claim on the basis of the evidence the defendant claims on appeal supports the charge, we would conclude, nonetheless, that the court did not abuse its discretion in denying the defendant's request to charge. In his appellate brief, the defendant argues that his testimony during cross-examination and redirect examination that he

[20] The defendant filed the following request to charge on diminished capacity: "Evidence has been presented during the trial from which you could conclude that the [d]efendant's behavior at and after the incident indicated a diminished mental capacity at the time of the incident. You may consider this in deciding whether the [d]efendant was mentally capable of forming the specific intent necessary to constitute the crimes charged, as I have previously defined the required specific intent for you. If you have a reasonable doubt as to whether the [d]efendant acted with the specific intent necessary to constitute the crimes charged you must find him not guilty of those crimes. *State* v. *Hines*, 187 Conn. 199 [445 A.2d 314] (1982); *State* v. *Thurman*, 10 Conn. App. 302 [523 A.2d 891, cert. denied, 204 Conn. 805, 528 A.2d 1152] (1987)."

[21] We note that to the extent that there is any ambiguity in the court's ruling, it is the defendant's responsibility to provide us with an adequate record for review, and we read an ambiguous record to support rather than to undermine a court's determination. See, e.g., *State* v. *Reynolds*, 264 Conn.

was out of his mind on the night in question provided sufficient foundation to warrant a charge on diminished capacity. On cross-examination the defendant testified that on the night of the fire, he saw someone lying at the top of the stairs, did not stop to identify the person, grabbed a gun and did not call for help. The prosecutor asked: "You fled, didn't you?" The defendant responded: "I ran because I was out of my mind." On redirect examination, defense counsel asked: "[C]an you say what you were thinking when you ran up the stairs of your house on the morning of December 13, [2003]?" After the court overruled the prosecutor's objection, the defendant answered: "I know I wasn't in my right mind, that's for sure." The court reasonably could have concluded that the defendant's testimony had nothing to do with his state of mind at the time of the crimes but, rather, was offered to explain his flight from the crime scene. Accordingly, the defendant's claim is without merit.[22]

The judgment is affirmed.

In this opinion SCHALLER, J., concurred.

FLYNN, J., concurring. I concur in the result reached and that the defendant's conviction should be affirmed. There was overwhelming evidence of the defendant's guilt. This evidence is pointed out in the majority opinion and needs no repetition. Its weight under the *Williams* factors militates against reversal. See *State* v. *Pereira*, 72 Conn. App. 545, 563–67, 805 A.2d 787 (2002), cert. denied, 262 Conn. 931, 815 A.2d 135 (2003).

I disagree with part I of the opinion holding that there was no impropriety. It has been said that nothing

1, 30 n.21, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

[22] We need not reach the question whether a witness' statement that he was out of his mind at the time of the crime would be sufficient, in itself, to require an instruction on diminished capacity.

exceeds like excess. Several of the prosecutor's questions were excessively sarcastic. Injection of sarcasm into a cross-examination is improper. *State* v. *Spiegelmann*, 81 Conn. App. 441, 457, 840 A.2d 69, cert. denied, 268 Conn. 921, 846 A.2d 882 (2004). The question before the jury was whether the defendant shot his wife and two daughters and then burned their bodies, intentionally causing their death. Despite the horror of the defendant's crime, the jury's deliberation could have been better able to proceed without the mocking, caustic tone inviting ridicule that the cross-examination of the defendant took.