STATE OF CONNECTICUT *v.* KENNETH BOYKIN
(AC 23815)

Foti, West and McLachlan, Js.

Argued April 19—officially released July 13, 2004

*David J. Reich,* for the appellant (defendant).

*Melissa L. Streeto,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Kevin Doyle,* assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Kenneth Boykin, appeals from the judgments of the trial court revoking his probation and committing him to the custody of the commissioner of correction for a total effective sentence of fifteen years. The defendant claims that (1) the court improperly admitted certain evidence, (2) prosecutorial misconduct deprived him of his right to due process and (3) the judgment is not supported by the evidence. We affirm the judgments of the trial court.

The following relevant facts underlie the defendant's appeal. On September 16, 1997, the defendant was released from a term of incarceration and began serving a five year probationary period.[1] One of the terms of the defendant's probation was that he not violate any criminal law of the state. On April 8, 2002, the defendant was charged with the crime of assault in the second degree in connection with the events underlying this appeal. On April 30, 2002, the defendant was charged with the crimes of assault in the third degree and breach

---

[1] On September 25, 1987, the defendant was sentenced, under three docket numbers, to serve a total effective sentence of thirty years incarceration, suspended after fifteen years, with five years of probation.

of the peace in the second degree in connection with an unrelated incident.

The state thereafter charged the defendant with violating the terms of his probation. From the evidence adduced at trial, primarily the testimony of the victim, Jose Santos, the court reasonably could have found the following facts. On February 5, 2002, the defendant asked Santos, his friend and coworker, to drive him home from work. Santos agreed. Santos drove the defendant to a home improvement store and then drove the defendant home. The defendant and Santos spent a few hours socializing with the defendant's mother and others at the defendant's home. Santos thereafter drove the defendant to two local bars, where they socialized for several hours without incident.

At or around midnight, Santos drove the defendant home. Santos told the defendant that he needed to urinate, then went behind the defendant's house to do so. The defendant came up behind Santos and struck him in the back of the head, causing Santos to lunge forward. Santos hit the defendant's house with the front of his body, turned around and asked the defendant why he had struck him. The defendant accused Santos of having slept with his wife.

Santos began walking back to his car, the engine of which he had left running in the defendant's driveway. The defendant picked up a stick, several feet in length, and approached Santos. Santos attempted to wrestle the stick from the defendant's grasp, but lost his footing. Santos fell on the ground, and the defendant struck him several times about the head and elsewhere with the stick. Santos ultimately ran to a neighbor's house and asked its residents to call for help. Police and emergency medical personnel arrived shortly thereafter. The defendant had lacerated Santos' scalp and caused him to sustain a nasal fracture.

At trial, the defendant testified that after he began working with Santos, he learned that Santos was bisexual. The defendant testified that although he and Santos thereafter were relatively less friendly socially, they maintained a friendly relationship as workers. The defendant recalled that on February 5, 2002, after arriving at his house at or around midnight, he and Santos went to the side of the house to urinate. The defendant further testified that Santos finished urinating, turned toward him, said, "let me help you," and "reached over to try and grab at [his] penis." The defendant testified that in response to that unwanted sexual advance, he pushed Santos in the face, causing him to fall backward and hit his head on a nearby wheelbarrow. The defendant testified that he told Santos to leave his property and that Santos ran from him. Additional facts will be set forth in the context of the defendant's claims.

I

The defendant first claims that the court improperly admitted evidence concerning murder charges that arose from an unrelated incident. The defendant argues that "[t]his evidence affected the outcome of the trial by unfairly influencing the trier of fact." We disagree.

The record reflects that during the adjudicative phase of the hearing, the prosecutor cross-examined the defendant concerning his conduct on the night in question. The prosecutor asked the defendant if he had gone inside his house and "went to bed" after he pushed Santos. The defendant responded: "I went upstairs and I—what did I do? I said, oh, God, what—what—you know what I did? I'm sitting there thinking what to do. I said, do I call the police? Do I tell the police? I said, Lord, I just done went through a trial. I'm on probation. First thing going to happen—I panicked. I got afraid. I said I don't want to think . . . ." The prosecutor then asked the defendant about the defendant's prior murder

trial. The defendant's attorney objected on the ground that the question called for an irrelevant and prejudicial response. The court noted that the defendant had "brought up the trial" and overruled the objection.

The defendant testified, in response to the prosecutor's questions, that he had been charged with murder. The defendant testified that the murder charge arose from an incident in which he had struggled with a man who had attempted to "carjack" his wife. The defendant related that the man produced a gun during the struggle and that the gun "went off" when he reached for it, resulting in the man's fatal injuries. The defendant testified that he had acted in self-defense and had been acquitted of the murder charge.

During the dispositional phase of the proceeding, the prosecutor referred to the fact that the defendant had "been acquitted of a murder charge" as evidence of the defendant's "violent manner." The defendant's attorney objected and asked that the court strike the argument. The court asked the defendant's attorney if he disputed the fact that the defendant had been acquitted of a murder charge. The defendant's attorney responded that he did not, but argued that the acquittal was "not a mark" against the defendant. The court stated that it was not improper for the prosecutor to mention the acquittal in his argument, but that it would nonetheless "not take the murder charge into account . . . ." The court explained that evidence concerning the murder charge would not prejudice the defendant and that rather than focusing on crimes that had not been proven, the court was concerned "about the crimes for which the defendant has been convicted and . . . concerned about the things that [the defendant] has demonstrably done while on probation including . . . [the] probation violation [that] has been found this very day." The court encouraged the prosecutor not to "dwell on the murder charge."

This court makes every reasonable presumption in favor of upholding the trial court's discretionary determinations. *State* v. *L'Minggio*, 71 Conn. App. 656, 661, 803 A.2d 408, cert. denied, 262 Conn. 902, 810 A.2d 270 (2002). We review evidentiary rulings by determining whether the court abused its discretion and whether the defendant has demonstrated that substantial prejudice or injustice resulted from the challenged rulings. Id.

The defendant claims that his testimony concerning an unrelated murder trial was irrelevant. It is undisputed, however, that it was the defendant who brought up the subject of his murder trial in an attempt to explain his conduct immediately following his altercation with Santos. The defendant testified not only that he did not report the incident with Santos to the police, but also that he did not answer his door when police arrived at his home after Santos reported the incident to police. The prosecutor's further inquiry was warranted because the defendant had initiated discussion of the topic of his prior trial in explaining his conduct and, to the extent that the prior charges influenced the defendant's state of mind and his conduct on the night in question, the evidence was relevant to evaluating the self-serving evidence that the defendant himself had introduced.

"[T]he 'opening the door' or 'invited error' doctrine does not stand for the proposition that 'two wrongs make a right' "; *State* v. *Martin*, 77 Conn. App. 818, 828 n.15, 827 A.2d 1 (2003); and the court should tailor any further inquiry under that doctrine to prevent any undue prejudice to either party. Here, the court permitted a brief inquiry. We conclude that the evidence did not cause the defendant substantial prejudice or injustice. That was evidence of a murder acquittal, not a conviction. The testimony was elicited before the trial judge and not a jury, which decreased the likelihood that the trier of fact would afford it undue weight. Furthermore,

during the dispositional phase, the trial judge explicitly stated that the evidence would not prejudice the defendant and specifically indicated that it was concerned with the defendant's acts of misconduct. The court implicitly indicated that it did not afford much, if any, weight to that evidence when it instructed the prosecutor not to "dwell" on it.

There was no abuse of discretion and, even if there was, the defendant has failed to demonstrate that the evidentiary ruling caused him substantial prejudice or injustice.

## II

The defendant next claims that a pattern of prosecutorial misconduct deprived him of his right to due process. We disagree.

The two aspects of this claim of prosecutorial misconduct are related to the defendant's first allegation that the court improperly admitted evidence of his charges for murder. First, the defendant claims that the prosecutor "acted to introduce highly prejudicial and irrelevant testimony" by questioning him about his murder trial. Second, the defendant claims that the prosecutor "used that prejudicial evidence in argument" during the dispositional phase of the proceeding. The underlying facts are set forth in part I. The defendant posits that "[b]ut for the misconduct of the prosecutor, [he] may have either prevailed at trial or received a lighter sentence."

Despite making timely objections to the prosecutor's questioning and argument at trial, the defendant did not raise a claim of prosecutorial misconduct at trial and now seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Recently, our Supreme Court, in *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004), clarified the due process analysis to be undertaken by a reviewing court in cases

involving incidents of prosecutorial misconduct that were not objected to at trial. Specifically, the court concluded that it is unnecessary for defendants to seek review of such claims under *Golding*, or for a reviewing court to undertake a *Golding* analysis of such claims. Id. The proper due process analysis requires a reviewing court to first determine whether misconduct occurred. Id., 572. If it did, the reviewing court must then determine, by applying the factors set out in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), whether the misconduct deprived the defendant of a fair trial. *State* v. *Stevenson,* supra, 573.

The court permitted the prosecutor, over objection, to elicit testimony from the defendant about his murder trial. The defendant's claim that the inquiry was inappropriate is purely evidentiary, and we have resolved that claim in part I. The defendant has not persuaded us that, by eliciting admissible testimony from the defendant, the prosecutor engaged in misconduct.

The second aspect of the defendant's claim is also evidentiary in nature. The defendant claims that the prosecutor engaged in misconduct in the dispositional phase of the trial by referring to the evidence of the murder trial that the court permitted him to elicit during the adjudicative phase of the trial. The defendant essentially argues that the prosecutor should have second-guessed the court's evidentiary ruling, recognized that the court improperly permitted him to elicit that testimony and omitted any reference thereto.

We know of no authority precluding the prosecutor from referring to evidence elicited during the evidentiary hearing, and the defendant certainly has not brought any to our attention.[2] It is obvious to us that

[2] To the contrary, in the dispositional phase, the court may consider evidence elicited during the trial, evidence of crimes for which the defendant was acquitted and other information that would have been properly considered at the original sentencing hearing. See *State* v. *Russell,* 58 Conn. App. 275, 280–81, 752 A.2d 59 (2000).

this claim is but another attempt to challenge the court's underlying evidentiary ruling, this time in the guise of a constitutional claim of prosecutorial misconduct. The defendant has failed to demonstrate that the prosecutor engaged in misconduct by referring to evidence that he properly elicited during the adjudicative phase of the proceeding.

The defendant has failed to point to any acts of prosecutorial misconduct. Accordingly, his claim that misconduct deprived him of a fair trial fails.

### III

Finally, the defendant claims that the judgment is not supported by the evidence. We disagree.

"In a probation revocation proceeding, the state bears the burden of proving by a fair preponderance of the evidence that the defendant violated the terms of his probation. . . . This court may reverse the trial court's finding that a defendant violated the terms of his probation only if such finding is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence to support it . . . or . . . the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling. . . . This court defers to the trial court's discretion in matters of determining credibility and the weight to be given to a witness' testimony. . . . Furthermore, [i]n making its factual determination, the trial court is entitled to draw reasonable and logical inferences from the evidence." (Internal quotation marks omitted.) *State* v. *Verdolini*, 76 Conn. App. 466, 468–69, 819 A.2d 901 (2003).

Having heard the testimony of the defendant and Santos, and having reviewed the evidence concerning

Santos' injuries, the court explained in its oral ruling that the evidence was "quite clear" that the defendant had assaulted Santos criminally in the manner that Santos described. The court noted that medical records indicated that Santos sustained an injury to his scalp as well as nasal bone fractures, and found that "there [was] no explanation as to how these could possibly have happened under the circumstances indicated by the defendant."

Apart from finding that Santos' injuries were consistent with Santos' testimony, the court also found that "common sense" led it to discredit the defendant's testimony. The defendant testified that during the course of his relationship with Santos, he learned that Santos was bisexual, believed that Santos had flirted with him and, on one occasion, confronted Santos and informed him that he was not interested in engaging in a homosexual relationship with him. According to the defendant, those incidents strained his friendship with Santos, yet he still asked him for a ride home and socialized with him on February 5, 2002.

The court noted that had Santos in fact made unwanted sexual advances toward the defendant in the past, it belied common sense that the defendant would have put himself in the situation that he portrayed by his testimony. That is, the defendant would not have socialized for hours with Santos and urinated outdoors just feet away from Santos. Further, the court explained that it belied common sense to believe that Santos, having made the sexual advance of which the defendant complained on the night in question, would have run along the street, asked a neighbor to call the police and left his car near the defendant's house. As the court put it, common sense dictated that Santos would have "gotten out of Dodge quite rapidly."

The defendant does not claim that Santos' testimony does not support a finding that he violated the terms

of his probation, and it is clear that Santos' testimony clearly supported the court's finding that the defendant assaulted Santos. The defendant argues, instead, that the court erroneously credited Santos' testimony. The defendant points out that the testimony of Santos and the defendant is "quite divergent." Evaluating that conflicting testimony was a matter "solely within the determination of the trier of fact." (Internal quotation marks omitted.) *State* v. *Hooks*, 80 Conn. App. 75, 82, 832 A.2d 690, cert. denied, 267 Conn. 908, 840 A.2d 1171 (2003). The court reasonably credited Santos' account of what occurred.

The defendant's argument that the injuries sustained by Santos somehow discredited Santos' testimony is without merit. Santos' significant head injuries were consistent with his testimony that the defendant came behind him, struck him in the head and later repeatedly struck him about his head. The defendant's claim that Santos should have sustained more cuts and bruises on other parts of his body, had the incident occurred as Santos described, is refutable. Santos testified that while he was lying on the ground and the defendant was striking him with a stick, he was wearing a "thick leather jacket" and was shielding himself from the defendant's blows. The leather jacket and Santos' defensive actions reasonably explain the fact that he sustained only the injuries that were reflected in the evidence.

The judgment is affirmed.

In this opinion the other judges concurred.