STATE OF CONNECTICUT *v.* ROBERT
OMAR MORGAN
(AC 33080)

Lavine, Bear and Espinosa, Js.

Argued October 10, 2012—officially released January 15, 2013

*Jeffrey D. Cedarfield,* for the appellant (defendant).

*James A. Killen,* senior assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky,* state's attorney, and *Elizabeth C. Leaming,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Robert Omar Morgan, appeals from the judgments of conviction, rendered after a jury trial, in docket number CR-09-0095016, of aggravated sexual assault in the first degree in violation of General Statutes § 53a-70a (a) (1), kidnapping in the first degree with a firearm in violation of General Statutes § 53a-92a (a) and threatening in the second degree in violation of General Statutes § 53a-62,[1] and, in docket number CR-09-0095017, of attempt to commit aggravated sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70a (a) (1), attempt to commit kidnapping in the first degree with

---

[1] The jury found the defendant not guilty of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (4).

a firearm in violation of §§ 53a-49 (a) (2) and 53a-92a (a), assault in the third degree in violation of General Statutes § 53a-61 and criminal mischief in the third degree in violation of General Statutes § 53a-117 (a) (1).[2] On appeal, the defendant claims that (1) there was insufficient evidence to support the jury's verdicts, (2) the court abused its discretion in consolidating the cases for trial and (3) the court improperly denied his motion for a new trial after he was deprived of due process by the prosecutor's improper questions and statements during closing argument. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts concerning the charges in docket number CR-09-0095016. In September, 2008, victim one[3] was a college senior, studying biomedical engineering, at the University of Connecticut (university). She resided in the Crandall building of the Hilltop Apartments, located behind Gampel Pavilion, up a hill. Shortly after midnight on September 6, 2008, victim one, wearing a new black shirt and a pair of jeans, took the late bus to the student union building with approximately eight of her friends. After talking with another friend at the student union for a while, victim one realized that the friends with whom she had arrived were no longer there. After reaching them via her cell phone, victim one learned that they already had left the student union to attend an off-campus party. Not wanting to go home and be alone, victim one telephoned her friend Cassandra to see if she wanted to do something. It was approximately 1 a.m., and, as victim one walked from the student union toward Gampel Pavilion, she talked with Cassandra,

<hr>

[2] The court sentenced the defendant to a total effective sentence of forty-one years imprisonment, six years of which is a mandatory minimum, followed by five years of special parole.

[3] To protect the identity of the victims and in keeping with the spirit of General Statutes § 54-86e, the names of the victims are omitted from this opinion.

who explained that she was tired and was going to go to bed. Victim one then telephoned her friend Stephanie and made plans to go to Stephanie's apartment, which was located in the Bethune building of the Hilltop Apartments.

As she continued to talk to Stephanie while walking toward the Hilltop Apartments, victim one, who was walking on a well paved and very well lit path, with some woods to her left, heard footsteps running behind her. When she turned around, the defendant, whom she described as a black male, approximately five feet, eight inches tall, wearing very baggy black pants and a hooded sweatshirt, with something that looked like a black and white bandana across the bottom of his face, was coming at her. The defendant grabbed victim one's cell phone, put his gloved hand over her mouth and pushed her to the ground. He also demanded money. When victim one attempted to give him her money, however, the defendant would not take it, and he attempted to move victim one into the woods. Victim one was lying facedown, and the defendant put a gun against the back of her head. After victim one was well into the woods, the defendant told her that he was going to kill her.

The defendant also asked victim one if she knew him; he then claimed that they had met at a party. Victim one remembered that she had met someone named Morris at a party approximately one week prior and that she had rejected him. After the defendant repeatedly asked victim one to state whom she thought he might be, victim one stated that she believed him to be Morris. The defendant then told her that she was correct. Victim one asked the defendant what he wanted from her, and he responded that he wanted her to take him to her apartment where he could make love to her. Victim one asked the defendant not to do this. The

defendant then told the victim that it was "sex or [her] life."

During much of this conversation, victim one continued to lie facedown, with the defendant holding what she thought was a gun to the back of her head or to her back. The defendant also placed a blindfold over the eyes of victim one, and, after victim one begged him to wear a condom, he helped her get up from the ground, they shook hands, and he had her feel a wrapped condom, which was in his hand. He also told her, however, that he did not have to wear the condom and that she did not know what diseases he might have. The defendant then moved victim one further into the woods, where he told her to remove her pants and to lean against a tree. The defendant groped victim one and grabbed her right breast over her new shirt. While victim one was pressed against a tree, the defendant attempted to penetrate both her anus and her vagina. The defendant had difficulty fully penetrating victim one, so he made her lie on the ground where he attempted again to penetrate her vaginally. Victim one repeatedly told the defendant that he was hurting her. The defendant yelled at the victim because he was having difficulty fully penetrating her; victim one tried to explain that she was a virgin and that she was not trying to hinder him. The defendant accused her of making things difficult for him.

The defendant had the victim move again, and he again ordered her to lie facedown. He removed her blindfold, told her that he was going to kill her, and she then felt something drop on top of her head, although it was not heavy. The defendant told her to continue lying facedown and not to move. Victim one then could hear that the defendant was moving farther and farther away from her. It appeared to victim one that the defendant was speaking to someone, perhaps on a cell phone, because he would speak, pause, and then speak again.

She also heard him say something like: "It didn't go as planned . . . ." (Internal quotation marks omitted.) Victim one waited for a brief period of time, then lifted her head and looked to see if the defendant was gone. She looked toward the lighted soccer field, located near the woods, and she saw the defendant jumping over the fence to the field. She also discovered that the item dropped on her head was her pants.

Victim one grabbed some of her belongings and ran up a hill toward the Hilltop Apartments, where she encountered a man and a woman whom she asked for help. Victim one was screaming and appeared to be very frightened. The man and woman escorted victim one into an apartment in Beard Hall, and the man telephoned 911. When Officer Paul Asella of the university police department arrived, victim one was hysterical. Officer Dawn Tomalonis also arrived at the apartment. Victim one later was transported to Rockville General Hospital, where a sexual assault collection kit was administered, and she was provided with medical treatment. Tomalonis drove to the hospital to offer comfort to victim one and to provide answers to her questions. While at the hospital, victim one was extremely upset, crying and shaking. She was "extremely tearful, very tremulous, act[ing] very ashamed and humiliated." A nurse placed victim one's clothing in an evidence bag and gave it to Tomalonis. The police later delivered that clothing and the sexual assault collection kit to the Connecticut Forensic Science Laboratory (lab) for DNA testing.

Following a wind and rain storm that occurred later during the morning of the attack, Asella went to the area of the reported attack with his K-9, Bennie, to look for physical evidence. Victim one's cell phone had been recovered in the area earlier that morning by Lieutenant Hans Rhynhart, and Asella had Bennie begin his search from that location. Bennie moved south, "almost in a

tracking posture," and found victim one's underwear, money and identification cards. Bennie then continued south/southeast to a fence at the soccer field, traveled along the fence line toward Stadium Road, turned west on that road and then went south onto Separatist Road. The search terminated at the Knollwood Apartments, which is where Morris lived.

The police questioned Morris and searched his apartment, but his account of his whereabouts at the time of the assault was corroborated by another person and by his cell phone records. The lab conducted an analysis of victim one's new shirt and, although the presence of semen or sperm was not detected, it was determined that the breast area of the shirt had at least three contributors to the DNA profile established, one of the contributors being victim one.[4] The lab also was able to determine that at least one of the contributors was male. Morris fully cooperated with the police in providing a DNA sample for analysis, which analysis excluded him as a possible contributor to the DNA profile obtained from the testing of victim one's new shirt. The profile obtained from the shirt, however, was entered into a national database, referred to as CODIS,[5] which,

---

[4] Craig O'Connor, an analyst from the department of forensic biology at the office of the chief medical examiner in New York, explained that "DNA is the hereditary material that's found inside all of us and makes us all who we are, makes us human. It's similar to a very long string of chemical structures of building blocks . . . and we get half of our DNA from our mother and half of our DNA from our father." He further explained that "[a]lthough 99 percent of our DNA is the same among humans, 99.9 percent to be exact, which is why we all have two arms, two legs, one head, about .1 percent of our DNA is different and that's what makes us unique. So with exception of identical twins, no two people have the same DNA [profile]."

[5] Christine Roy, a forensic science examiner at the lab, testified that CODIS is a DNA database that "compares known profiles that are in the database from convicted offenders from all the labs that contribute profiles into the CODIS system, and it also compares forensic samples. So, once we do testing for a case, if it matches or [if] it follows certain guidelines, we can put that profile into the database. . . . So, there's a constant comparison . . . ."

on June 18, 2009, found a match with a profile obtained from a white stain inside the front collar of a T-shirt that was evidence in another university sexual assault case. Further testing revealed that the defendant was a contributor to the DNA profile obtained from victim one's new shirt.[6]

The jury reasonably could have found the following facts concerning the charges in docket number CR-09-0095017. On June 2, 2009, victim two, who was a self-employed yoga instructor, picked up lunch at a local restaurant and took it, along with her computer, to the Horse Barn Hill area on or near the university campus. Victim two described this location as "a beautiful hill area with[in] the agricultural area of the university." She parked her vehicle and, with the windows down, ate her lunch. Soon thereafter, victim two went for a walk on a dirt road that goes up to the top of the hill. She walked for thirty to forty minutes and then returned to her vehicle, where other cars also were parked, at approximately 1:40 p.m. Victim two grabbed a blanket from the trunk of her vehicle and, with her laptop computer, phone and sunglasses in hand, walked across the paved road, down a service road and found a peaceful place to sit in a large field that had a nice view. The field had been cut, and there was a large section of woods nearby. Victim two sat down in the field to do some writing. She had visited this location many times, and she felt safe. There were plenty of people coming and going, and "there was just no question in [her] mind [that she] was just in a good place."

As victim two worked on her computer that afternoon, she heard footsteps running toward her. Thinking

---

[6] Roy testified that the "expected frequency of individuals who could be a contributor to the DNA profile from the swabs from the outer breast area of the shirt [was] approximately one in fifty-nine million in the African-American population, approximately one in a hundred and five million in the Caucasian population, and approximately one in sixty-four million in the Hispanic population."

it must be someone whom she knew, victim two turned around. She saw a black male, between five feet six and five feet eight inches tall, with a small build, standing just above her wearing black shoes, black pants and a black hooded sweatshirt, pointing a gun at her face. His hood was up, over his head, and he wore gloves and a black cloth across the bottom portion of his face. His clothing fit loosely, and he appeared to be a young man. She screamed and turned away. The man got down behind her, put his hand over her face, grabbed at her body, and the two struggled. At one point during the struggle, victim two and the defendant were face to face, and she looked at him, "see[ing] into his face." The defendant was trying to pull victim two into the wooded area. While getting bruised and scraped, victim two continued to struggle and to scream. A vehicle appeared, and the defendant let go of victim two, got up and started running toward the woods. Victim two noticed that the defendant had a wide gait as he ran away.

Victim two gathered her things and began backing toward the road, watching the defendant leave the area. She dialed 911 from her cell phone, and the police responded immediately. Sergeant Hector Gonzalez of the university police arrived on the scene with his K-9, Arko, a German shepherd, and they quickly went to search an area to which victim two indicated the defendant had run. Officer Tomalonis remained with victim two, and additional officers also arrived.

Officer Peter Harris accompanied Gonzalez and Arko on their search. Arko led Gonzalez in a northerly direction and, approximately fifty yards into the woods, signaled that he had found something. Gonzalez spotted a black T-shirt on the ground, and Harris radioed in that they had found a piece of evidence. The T-shirt was on top of the foliage on the ground and did not appear soiled or damp. They continued their search for

a short time, but Gonzalez sprained his ankle, slowing down Arko, and Arko apparently lost the defendant's scent and began to circle. Gonzalez then discontinued the track.

Harris soon thereafter met with Detectives Meshanic and Cook, took them to the location where the T-shirt was spotted, and they photographed the T-shirt and collected it as evidence. An additional German shepherd arrived at the scene, and Harris accompanied the dog and its handler as they tracked a scent from the location where the T-shirt was recovered to Moulton Road. An additional tracking dog, a bloodhound, also was brought to the area where the T-shirt was found, and it also tracked the scent through the woods to the same location on Moulton Road.

Members of the university police department and the state police also conducted motor vehicle stops and person checks[7] in the area of individuals who matched the description of the attacker. In the days that followed the attack, Harris communicated with the state police and received the names and contact information of five individuals who had been stopped shortly after the attack was reported. The defendant was one of those individuals; he had been driving a delivery truck at the time he was stopped. As Harris further investigated the defendant's delivery schedule around the time of the attack, he discovered that there was a time gap of one hour and twenty-six minutes in the schedule and that the attack on victim two had occurred during that time gap.[8] When questioned about what he had done during this period, the defendant stated that he had parked

---

[7] Harris explained that "person checks" were stops of individuals who fit the description of the attacker, but who were on foot rather than in motor vehicles.

[8] The defendant's last scheduled delivery before the one hour and twenty-six minute time gap took place at 1:38 p.m., and victim two's call to 911 occurred at 2:35 p.m.

his delivery truck near a bridge that is near the Fenton River so that he could sweep out the truck, which took approximately fifteen to twenty minutes. On more than one occasion, Harris questioned the defendant regarding the time gap, but the defendant could not account for anything more than fifteen to twenty minutes of the one hour and twenty-six minute time gap in his delivery schedule.

Although initially unwilling, the defendant later agreed to provide Harris with a DNA sample in the form of a buccal swab and did so on June 10, 2009.[9] Employees of the lab conducted testing of the T-shirt that had been found near the scene of victim two's assault, including testing of a white stain found on the T-shirt. The stain tested positive for saliva that, after further analysis, ultimately, proved to match the defendant's DNA profile.[10]

The defendant was arrested on August 4, 2009, and charged in the two separate docket numbers. In docket number CR-09-0095016, the defendant was charged with aggravated sexual assault in the first degree, kidnapping in the first degree with a firearm, threatening in the second degree and attempt to commit robbery in the first degree, and, in docket number CR-09-0095017, the defendant was charged with attempt to commit aggravated sexual assault in the first degree, attempt to commit kidnapping in the first degree with a firearm, assault in the third degree and criminal mischief in the third degree.

---

[9] Harris explained that a buccal swab is similar to a big cotton swab, and that it is swabbed inside the mouth to get skin cells for DNA analysis.

[10] Melanie Russell, a DNA analyst at the lab, testified that "the profile that was generated from the cutting of the [T-shirt] was the same as [the defendant's] known DNA profile." She also testified that the "statistics for someone's DNA profile randomly matching the profile from the . . . [T-shirt was] . . . less than one in seven billion." She also explained that "[s]even billion is approximately the population of the earth."

Following his arrest, the defendant was questioned by Sergeant Daniel Gugliotti of the university police department. During questioning, the defendant denied owning or having access to a gun or a facsimile or toy gun, including a pellet gun or an air-soft gun.[11] When they were executing a search warrant of the defendant's home, however, officers found 0.6 millimeter air-soft ammunition and a $CO_2$ cartridge under the defendant's mattress in his bedroom and a container of air-soft pellets in a closet in the home.[12] Officers also found a white bandana with black markings on the closet floor in the defendant's bedroom. Officers also discovered, inter alia, at least two black hooded sweatshirts and two pairs of black sweatpants in a trash bag in the hallway just outside of the defendant's bedroom[13] and another dark colored hooded sweatshirt in a suitcase in his bedroom closet. Similar additional clothing also was found in the bedroom bureau.

Before trial commenced, the state moved for a consolidated trial on the charges in both docket numbers. The defendant objected, and, on August 20, 2010, the court heard oral argument on the issue. The prosecutor argued that consolidation was favored in Connecticut and that it was authorized expressly by General Statutes

[11] Gugliotti explained that an air-soft gun is "a recreational gun . . . that looks identical—virtually identical to a real gun. It has a cartridge that . . . propels the gun, a $CO_2$ cartridge, a gas cartridge that's fit into the gun to make the projectile shoot out, and it shoots plastic—little plastic pellets just under a quarter of an inch in diameter."

[12] Analysis on the defendant's cell phone, conducted by the Federal Bureau of Investigation, revealed several photographs, taken on February 27, 2009, of a dark-skinned hand, holding a black Crossman air-soft handgun. Further analysis of those photographs by the state forensic science lab revealed, through palm print analysis, that the hand shown in those photographs was the hand of the defendant.

[13] When looking at the evidence during trial, Gugliotti testified that one of the hooded sweatshirts and one of the sweatpants appeared to be more of a dark navy blue in color. We note that there also were other items of clothing in the trash bag.

§ 54-57[14] and Practice Book § 41-19 because it "reduces congestion of trial dockets, conserves judicial time . . . lessens the burden on citizens in the community who serve as jurors and . . . avoid[s] the need to recall witnesses [who] would need to testify in both cases." She also argued that there would be no prejudice to the defendant in consolidating the cases because the evidence from each case was cross admissible in the other case for three reasons, namely, propensity, intent and identity. The defendant argued that the evidence of the crimes charged in these dockets was not cross admissible, the crimes were not similar and the defendant would be prejudiced by consolidation. He explained that on the basis of *State* v. *Gupta*, 297 Conn. 211, 998 A.2d 1085 (2010), there would be clear prejudice if the jury were to hear the facts of both cases. On August 24, 2010, the court, after stating that case law requires a presumption in favor of consolidation, and after thoroughly discussing the similarities and differences between the crimes charged in each docket number, the relevant case law, including *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987), and our rules of practice, granted the state's motion for consolidation after concluding that the evidence from each case was cross admissible.[15] The defendant, thereafter, was tried before a jury and found guilty on all

[14] As our Supreme Court recently clarified, "a trial court's ruling on a motion for joinder of multiple informations for trial implicates Practice Book § 41-19, not General Statutes § 54-57." *State* v. *LaFleur*, 307 Conn. 115, 154–55, 51 A.3d 1048 (2012).

General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise." Our Supreme Court has explained that "[§] 54-57 is directed at prosecutors, [rather than at the trial court] and governs the circumstances under which they may join multiple charges in a single information." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 155 n.32.

[15] The court specifically found that the evidence in each of the cases was cross admissible to establish the defendant's propensity, identity and intent.

charges except the charge of attempt to commit robbery in the first degree. This appeal followed.

I

The defendant first claims that there was insufficient evidence that he was the perpetrator of the crimes against either victim. We disagree. After setting forth our standard of review for claims of evidentiary insufficiency, we will consider separately the evidence presented in each of the cases brought against the defendant.

"We review a claim of evidentiary insufficiency by applying a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Fourtin*, 307 Conn. 186, 197–98, 52 A.3d 674 (2012).

A

The defendant argues: "The evidence was insufficient to prove, beyond a reasonable doubt, that [he] was the person who assaulted [victim one]. The only evidence offered to prove that the [d]efendant was that person was the DNA taken from the swab of [victim one's] shirt. That evidence is insufficient to prove that the

[d]efendant committed this crime for several overlapping and interrelated reasons." We disagree with the defendant's claim and with his contention that the DNA found on victim one's shirt was the only evidence offered by the state.

We first address the defendant's argument that the DNA evidence obtained from victim one's new shirt was legally insufficient because of the presence of other, unidentified DNA on the shirt. We conclude that we need not determine whether such evidence, standing alone, would be legally sufficient to support a guilty verdict in this case because there was additional evidence before the jury, which, combined with the DNA evidence, supports the jury's verdict. As to the DNA evidence, we conclude that the mere presence of other unidentified DNA, in addition to the defendant's DNA, does not render the evidence that his DNA was present irrelevant or nonprobative.[16] See *State* v. *Rinaldi*, 220 Conn. 345, 353, 599 A.2d 1 (1991) ("evidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered] even to a slight degree"); see generally *State* v. *Butler*, 129 Conn. App. 833, 840–41, 21 A.3d 583 (defendant not entitled to DNA testing of hairs found in mask worn by perpetrator because even if "testing of the hairs in the mask would reveal the presence of [other people's] DNA . . . [t]he presence of [their] DNA in the mask merely would establish that [they] had worn the mask at some unknown point in time, not that [they were] involved in the [crimes] . . . [and] such evidence would not establish that the [defendant] either had never worn the mask or had not committed the [crimes]"), cert. denied, 302 Conn. 923, 28 A.3d

---

[16] During the defendant's oral argument before this court, Judge Lavine asked appellate counsel to clarify whether he was "arguing that the state has to exclude—determine who the unidentified individual is and exclude that person in order to obtain a conviction." Counsel responded: "Correct."

340 (2011). Certainly, the DNA evidence identifying the defendant was both relevant and probative. Here, expert testimony revealed that the DNA found on victim one's new shirt was consistent with the defendant's DNA profile. The presence of the DNA of one or more additional individuals was a matter for the jury's consideration.

Additionally, the evidence that the defendant's DNA was on victim one's new shirt was not the only evidence before the jury. The state also offered evidence that victim one described her attacker as a black male, approximately five feet, eight inches tall. She further described her attacker as wearing very baggy black pants and a black hooded sweatshirt, with a black and white bandana across the bottom of his face. Victim one also stated that her attacker put a gun to the back of her head. When the defendant was questioned by police, he denied owning or having access to any type of gun, whether real or a facsimile; yet, the police found 0.6 millimeter air-soft ammunition and a $CO_2$ cartridge under the defendant's mattress and a container of air-soft pellets in a closet in his home, all of which could be used in an air-soft gun, and they discovered recent photographs on the defendant's cell phone of the defendant's hand holding an air-soft gun. See *State* v. *Rosado*, 134 Conn. App. 505, 512–13, 39 A.3d 1156, cert. denied, 305 Conn. 905, 44 A.3d 181 (2012), citing *State* v. *Jimenez*, 74 Conn. App. 195, 212, 810 A.2d 848 (2002) (misstatement made to police subsequent to crime probative of consciousness of guilt), cert. denied, 262 Conn. 947, 815 A.2d 677 (2003). Police also found a black and white bandana in the defendant's bedroom and found clothing that closely matched the attacker's clothing as described by victim one. All of this evidence, although circumstantial, in addition to the DNA evidence, was before the jury; the jury also had the ability to see the defendant, who was at his trial. The probative force of

the evidence is not diminished simply because it consists of circumstantial, rather than direct, evidence. *State* v. *Ledbetter*, 275 Conn. 534, 542–43, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 125 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Rosado*, supra, 134 Conn. App. 513. In light of the evidence presented and the inferences that reasonably could be drawn therefrom, we conclude that the jury reasonably could have determined that the state established the defendant's guilt beyond a reasonable doubt on the charges of aggravated sexual assault in the first degree, kidnapping in the first degree with a firearm and threatening in the second degree alleged in docket number CR-09-0095016.

B

The defendant also argues: "The evidence was insufficient to prove, beyond a reasonable doubt, that the [d]efendant was the person who assaulted [victim two]. The only evidence offered in support of that conclusion was the DNA evidence taken from the T-shirt that was discovered upon the canine track. That evidence is insufficient . . . [because] the DNA testing revealed that presence of a third person's DNA and that person is as likely the assailant as is the [d]efendant [and] . . . the DNA evidence only proves, at best, that the [d]efendant, or something that the [d]efendant came in contact with, touched the T-shirt." We again disagree with the defendant's claim and with his contention that the DNA found on the T-shirt was the only evidence offered by the state.

As we discussed in part I A of the opinion, the mere presence of the DNA of another individual on the evidence, in addition to the defendant's DNA, does not render such evidence irrelevant or nonprobative. See *State* v. *Rinaldi*, supra, 220 Conn. 353; see generally *State* v. *Butler*, supra, 129 Conn. App. 840–41. As to the defendant, the evidence was both relevant and probative. Furthermore, in addition to the DNA evidence, the state also presented evidence that victim two described her attacker as a black male, between five feet, six and five feet, eight inches tall, with a small build. He wore black shoes, and loosely fitting black pants and a black hooded sweatshirt. He also pointed a gun at her face. Victim two's attacker wore gloves and a black cloth across the bottom portion of his face.

Although the defendant denied owning or having access to any type of gun, the police recovered 0.6 millimeter air-soft ammunition, a $CO_2$ cartridge and a container of air-soft pellets in the defendant's home. The police also discovered recent photographs on the defendant's cell phone of the defendant's hand holding an air-soft gun. See *State* v. *Rosado*, supra, 134 Conn. App. 512–13. The police also found in the defendant's home clothing that closely matched the clothing worn by victim two's attacker. As explained in part I A of this opinion, this evidence, although circumstantial, in addition to the DNA evidence, was before the jury, and the jury also had the ability to see the defendant. We reiterate that the probative force of the evidence is not diminished simply because it consists of circumstantial evidence, rather than direct evidence. *State* v. *Ledbetter*, supra, 275 Conn. 542–43.

In light of the evidence presented and the inferences that reasonably could be drawn therefrom, we conclude that the jury reasonably could have determined that the state established the defendant's guilt beyond a reasonable doubt on the charges of attempt to commit

aggravated sexual assault in the first degree, attempt to commit kidnapping in the first degree with a firearm, assault in the third degree and criminal mischief in the third degree alleged in docket number CR09-0095017.

## II

The defendant next claims that the court abused its discretion when it granted the state's motion to consolidate the cases for trial. He argues that the two cases were so dissimilar that the evidence from each case was not cross admissible in the other case and that, even if the evidence was cross admissible, the probative value of the evidence was far outweighed by the possibility of prejudice, and "no amount of judicial instruction . . . would remedy [the] prejudice . . . ." Additionally, he argues that consolidation was improper in this case under the *Boscarino* factors. See *State* v. *Boscarino*, supra, 204 Conn. 722–24. We conclude that the evidence in the cases was cross admissible and that the court did not abuse its discretion in granting the motion to consolidate.

Our Supreme Court recently revisited the principles that govern appellate review of a trial court's ruling on a motion for joinder or consolidation: "As we clarified in *State* v. *Payne*, 303 Conn. 538, 547, 34 A.3d 370 (2012), a trial court's ruling on a motion for joinder of multiple informations for trial implicates Practice Book § 41-19, not General Statutes § 54-57. Practice Book § 41-19 provides that [t]he judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together. A long line of cases establishes that the paramount concern is whether the defendant's right to a fair trial will be impaired. Therefore, in considering whether joinder is proper, this court has recognized that, where evidence of one incident would be admissible at the trial of the

other incident, separate trials would provide the defendant no significant benefit. . . . Under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. . . . Accordingly, we have found joinder to be proper where the evidence of other crimes or uncharged misconduct [was] cross admissible at separate trials. . . . Where evidence is cross admissible, therefore, our inquiry ends." (Citations omitted; internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 154–55, 51 A.3d 1048 (2012).

In the present case, the state argues that, although the trial court applied a presumption in favor of consolidation that, despite being proper at the time, later was disfavored by our Supreme Court; see *State* v. *Payne*, supra, 303 Conn. 548–49 (holding that blanket presumption in favor of consolidation, previously recognized, now is improper); the application of that presumption was harmless because the state did prove, by a preponderance of the evidence, that the evidence in the cases was cross admissible or that the defendant was not unfairly prejudiced under the *Boscarino* factors. See id., 550 ("state may satisfy [its] burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced pursuant to the *Boscarino* factors"). We agree that the application of this presumption was harmless because the state submitted sufficient proof that the evidence was cross admissible.

As our Supreme Court explained in *LaFleur*: "Although, under an established line of cases, trial courts had been directed to apply a presumption in favor of joinder and to place the burden on the defendant to prove that joinder is improper, in *Payne*, which was decided after the trial in the present case, we determined that this blanket presumption was improper and

that a different allocation of proof should be applied: [W]hen charges are set forth in separate informations, presumably because they are not of the same character, and the state has moved in the trial court to join the multiple informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced pursuant to the *Boscarino* factors." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 156–57. Despite the reallocation of the burden of proof, "when the trial court is faced with the question of joinder of cases for trial, the defendant's burden of proving error on appeal when we review the trial court's order of joinder remains the same. . . . [I]t is the defendant's burden on appeal to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . ." (Internal quotation marks omitted.) Id., 157–58. Although the burden of proof has been shifted to the state in the trial court, "even after *Payne*, our appellate standard of review remains intact. Accordingly, [i]n deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb." (Internal quotation marks omitted.) Id., 158.

Although the court used a presumption that has since been disavowed, on the basis of our review of the record, we, nevertheless, are persuaded, as was our Supreme Court in *LaFleur*, that the application of the presumption made no difference in this case; see id., 159; because the state established, by a preponderance of the evidence, that the evidence was cross admissible. Accordingly, the trial court did not abuse its discretion

in granting the state's motion to consolidate on the ground of cross admissibility.

Although "[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person"; Conn. Code Evid. § 4-5 (a); "[e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." Conn. Code Evid. § 4-5 (b). Our Supreme Court also "recently . . . adopted an exception to § 4-5 (a) of the Connecticut Code of Evidence . . . allowing the admission of prior misconduct evidence to establish propensity in sex related cases if certain conditions are met. See *State* v. *DeJesus*, [288 Conn. 418, 470–74, 953 A.2d 45 (2008)]. Specifically, [it] concluded in *DeJesus* that evidence of uncharged sexual misconduct is admissible only if it is relevant to prove that [a] defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she [was] charged. Relevancy is established by satisfying the liberal standard pursuant to which [prior sex crimes] evidence previously was admitted under the common scheme or plan exception. Accordingly, evidence of uncharged misconduct [or other crimes] is relevant to prove that [a] defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed [against] persons similar to the prosecuting witness. . . ."[17]

---

[17] Our Supreme Court in *Gupta* explained that "in *DeJesus* . . . we finally conceded that our liberal admission of prior sexual misconduct under the common plan or scheme exception to the bar against the use of propensity evidence was in fact a rule permitting such evidence to be used for propensity purposes. *State* v. *DeJesus*, supra, 288 Conn. 473–74. . . . As *DeJesus* makes clear, however, although we changed the label of the exception, we did not change the parameters that such evidence must satisfy to be admissible.

"[Such] [e]vidence . . . is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission. . . . In balancing the probative value of such evidence against its prejudicial effect, however, trial courts must be mindful of the purpose for which the evidence is to be admitted, namely, to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity." (Internal quotation marks omitted.) *State* v. *Gupta*, supra, 297 Conn. 224.

In the present case, the court relied specifically on the three factors articulated in *State* v. *DeJesus*, supra, 288 Conn. 473, to conclude that consolidation of the cases was appropriate on cross admissibility grounds. Specifically, the court reasoned that the cases were not remote in time, being only nine months apart. It further reasoned that "[b]oth incidents occurred on the [university] campus . . . only 1.8 miles apart." Both attacks also occurred near wooded areas, and "the perpetrator tried to use the woods to conceal his actions from public view." In each of the cases, the victims were preoccupied, engaged in "other activities at the time they were grabbed. [Victim one] was using her cell phone and walking; [victim two] was using her laptop in the field. . . . Both of the victims . . . indicated that the perpetrator . . . was in the range of five-six or five-nine inches [tall]." "Both [victims] claim that the . . . perpetrator was a black male . . . [who] wore black pants or dark-colored pants . . . [and wore] black hooded sweatshirts." The court also found "two

See id., 473 (citing court's earlier sexual misconduct cases admitting evidence under common scheme exception as setting forth limits under which propensity evidence could be admitted); see also id., 467 (citing *State* v. *Ellis*, [270 Conn. 337, 358–59, 852 A.2d 672 (2004)], as case in which evidence did not meet liberal common plan or scheme exception for similar prior sexual misconduct). Therefore, *DeJesus* in no way undermines the vitality of the reasoning in *Ellis*." *State* v. *Gupta*, supra, 297 Conn. 225 n.7.

aspects of [the perpetrators'] clothing to be more unique because the perpetrator in both cases wrapped some form of a cloth around his face from his nose down as opposed, for instance, to wearing a ski mask or some other type of device that would conceal his identity." The court also found it significant and distinguishing that, in each case, the perpetrator wore gloves. Additionally, the court reasoned that the conduct of the assailant was similar in both cases in that "the perpetrator [was] alleged to have come up from behind [each victim] and attempt[ed] to take each of the victims into a wooded area." Finally, the court reasoned that both victims were quite similar, with the exception of their ages, but that both "women . . . [were] in the primes of their life or approaching the primes of their life." The court also noted that both victims were petite and that, because the assailant approached both women from behind, it was likely that he could not perceive a difference in their ages.

Despite the trial court's conclusion that the evidence from both cases was cross admissible because it met the three factors articulated in *DeJesus*, the defendant maintains that the court abused its discretion in consolidating the cases because "their probative value is outweighed by the prejudice resulting from their admission." Aside from claiming this prejudice, however, the defendant fails to explain how he was prejudiced by the consolidation of these cases or why any resulting prejudice was not cured by the court's repeated cautioning of the jury. See *State* v. *Payne*, supra, 303 Conn. 550 n.11 ("Despite our reallocation of the burden when the trial court is faced with the question of joinder of cases for trial, the defendant's burden of proving error on appeal when we review the trial court's order of joinder remains the same. See *State* v. *Ellis*, 270 Conn. 337, 376, 852 A.2d 676 [2004] ['(I)t is the defendant's burden on appeal to show that joinder

was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury' . . . .]'"); *State* v. *Gupta*, supra, 297 Conn. 223 ("[t]he defendant bears a heavy burden of showing that . . . any resulting prejudice [from joinder] was beyond the curative power of the court's instructions" [internal quotation marks omitted]). Accordingly, we are not persuaded.

We note that in the present case, the court repeatedly cautioned the jury. In its initial instructions to the jury, the court explained that the state had commenced two separate cases against the defendant and that "the defendant [was] entitled to and must be given . . . separate independent determinations of whether he is guilty or not guilty as to each of the counts in each information." Throughout the defendant's trial, the court repeatedly cautioned the jury, on nearly a daily basis, that it must consider each of the cases separately and independently of each other. Further, at the close of trial, when giving its final instructions to the jury, the court instructed the jury that each information was separate, that the state had "commenced two separate cases against the defendant" and that the cases had "been consolidated for the convenience of the trial." The court also instructed that the defendant was entitled to separate and independent determinations on each information.

For all of the foregoing reasons, we conclude that the court did not abuse its discretion in granting the state's motion for consolidation on the basis of cross admissibility of the evidence.

### III

The defendant also claims that he was "deprived of his constitutional right to a fair trial by the prosecutor's improper comments." He argues that "the prosecutor repeatedly asked questions and made comments

designed to highlight the connectivity of the two cases thereby depriving the defendant of his constitutional right to separate consideration of the two informations." The defendant points to three instances where the prosecutor, in questioning witnesses, allegedly drew a connection between both cases and to closing and rebuttal argument when she twice discussed the fact that the defendant's DNA was found at both crime scenes. He argues that "[t]hese improprieties were repeated and targeted not only the central issue in the case, identity, but the most constitutionally sensitive area, consolidation . . . ." The state argues that, because the court concluded that the evidence of each case was cross admissible for identity and intent, "the claim of prosecutorial impropriety on the basis of remarks suggesting a 'connectivity' between the two cases should be rejected out-of-hand, as the prosecutor merely was acting in accordance with a ruling of the court. In the alternative, the state argues that the comments were not improper and that they did not violate the defendant's right to due process. We conclude that the questions and comments were not improper in light of the court's ruling on the cross admissibility of the evidence on issues including intent and identity and that the defendant's claim essentially is a recharacterization of his claim that the court improperly ruled that the evidence was cross admissible.

The defendant alleges that the prosecutor's questions and closing argument comments were improper because they were "designed to highlight the connectivity of the two cases . . . ." We conclude that these questions and the statements made during closing and rebuttal argument were not improper because the court already had ruled that the evidence of each case was cross admissible in the other case, for purposes includ-

ing intent and identity.[18] A review of the record reveals that the prosecutor acted in accordance with the ruling of the court and that her argument was based on facts elicited from the evidence. See *State* v. *Boykin*, 83 Conn. App. 832, 839–40, 851 A.2d 384 (holding claim of prosecutorial impropriety was attempt to reassert challenges to court's underlying rulings), cert. denied, 271 Conn. 911, 859 A.2d 570 (2004). We conclude that the defendant's prosecutorial impropriety claim merely is a recharacterization of his claim that the court abused its discretion in consolidating the cases on the basis of cross admissibility. Having already concluded in part II of this opinion that this ruling was not improper, we decline to comment further on the issue.

The judgments are affirmed.

In this opinion the other judges concurred.

---

[18] Although the defendant argued during rebuttal that the court had ruled only that the evidence was cross admissible on the issue of intent, but not on the issue of identity, the record reveals otherwise. The transcript of the court's ruling on the state's motion for consolidation reveals that the court specifically found that the cases were cross admissible on the basis of propensity, identity and intent. We agree, however, that the court's final charge to the jury originally did not include an instruction that the evidence was cross admissible on the issue of identity. It was not until after closing argument that the court agreed to change its charge to include that language.